No. 24-1345

_____

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

DAVID HIEBER,

*Plaintiff-Appellant*,

v.

OAKLAND COUNTY and
KYLE JEN, in his Official and
Individual capacities,

*Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the Eastern District of Michigan
No. 4:22-cv-11417-FKB-EAS

_____

**APPELLANT DAVID HIEBER'S BRIEF**

_____

Prepared by:
KEVIN J. KELLY (P74546)
THE MASTROMARCO FIRM
Attorneys for Plaintiff-Appellant
1024 N. Michigan Avenue
Saginaw, Michigan 48602
(989) 752-1414
kkelly@mastromarcofirm.com

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv

STATEMENT REQUESTING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .vi

STATEMENT OF ISSUES FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . .vii

STATEMENT OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

STATEMENT OF CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    I.     PROCEDURAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

    II.    SUBSTANTIVE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

    I.     STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

    II.    THAT THE DISTRICT COURT ERRED IN FAILING TO FIND
          A FACTUAL DISPUTE REGARDING PLAINTIFF'S AGE
          DISCRIMINATION CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    III.   THAT THE DISTRICT COURT ERRED IN FAILING TO FIND
          A FACTUAL DISPUTE REGARDING PLAINTIFF'S POLITICAL
          AFFILIATION RETALIATION CLAIM . . . . . . . . . . . . . . . . . . . . .34

    IV.   THAT THE DISTRICT COURT ERRED IN FAILING TO FIND
          A FACTUAL DISPUTE REGARDING PLAINTIFF'S PRE-
          DEPRIVATION DUE PROCESS CLAIM . . . . . . . . . . . . . . . . . . .37

    V.    THAT THE DISTRICT COURT ERRED IN FAILING TO FIND
          A FACTUAL DISPUTE REGARDING PLAINTIFF'S POST-
          DEPRIVATION DUE PROCESS CLAIM . . . . . . . . . . . . . . . . . . .44

    VI.   THAT THE DISTRICT COURT ERRED IN FAILING TO FIND
          A FACTUAL DISPTUE REGARDING WHETHER DEFENDANT

JEN WAS ENTITLED TO QUALIFIED IMMUNITY . . . . . . . . . . 50

VII.   THAT THE DISTRICT COURT ERRED IN FAILING TO FIND
A FACTUAL DISPUTE REGARDING PLAINTIFF'S
DEFAMATION CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

CONCLUSION & RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . . . . . . .61

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .62

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .63

ADDENDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .64

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Sixth Circuit Rule 26.1, Plaintiff-Appellant, David Hieber, makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?

**ANWER:**

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

**ANSWER:**

No.

<div align="right">

Respectfully submitted,
THE MASTROMARCO FIRM

</div>

Dated: <u>October 21, 2024</u>        By:    */s/ Kevin J. Kelly*_____
KEVIN J. KELLY (P74546)
Attorneys for Plaintiff-Appellant
1024 N. Michigan Avenue
Saginaw, Michigan 48602
(989) 752-1414
kkelly@mastromarcofirm.com

## STATEMENT REQUESTING ORAL ARGUMENT

Plaintiff-Appellant believes that oral argument is necessary as it will afford counsel the opportunity to address any questions that the Court may have concerning the lower court's record and specifics of the parties' respective positions on appeal. Therefore, pursuant to Rule 35 of the Federal Rules of Appellate Procedure, Plaintiff-Appellant respectfully requests that this Court docket his appeal for oral arguments. FED. R. APP. P. 34; 6 Cir. R. 28(b)(1)(B).

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

## <u>STATEMENT OF JURISDICTION</u>

The district court had original jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 as multiple claims were brought pursuant to 42 U.S.C. § 1983 and, as such, arose under the Constitution and laws of the United States, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  On March 27, 2024, the district court entered an opinion and order granting Defendants' motion for summary judgment and final judgment, dismissing Plaintiff's case.  (**ECF No. 78, PageID.3125-3172**); (**ECF No. 79, PageID.3173**).  On April 22, 2024, Plaintiff filed a notice of appeal.  (**ECF No. 83, PageID.3226-3227**).  Plaintiff took appeal from a final order or judgment and the Court of Appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## <u>STATEMENT OF ISSUES FOR REVIEW</u>

I.    Whether the District Court erred in failing to find a factual dispute regarding Plaintiff's age discrimination claims?

II.   Whether the District Court erred in failing to find a factual dispute regarding Plaintiff's political affiliation retaliation claim?

III.  Whether the District Court erred in failing to find a factual dispute regarding Plaintiff's pre-deprivation due process claim?

IV.   Whether the District Court erred in failing to find a factual dispute regarding Plaintiff's post-deprivation due process claim?

V.    Whether the District Court erred in failing to find a factual dispute regarding whether Defendant Jen was entitled to qualified immunity?

VI.   Whether the District Court erred in failing to find a factual dispute regarding Plaintiff's defamation claim?

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

# STATEMENT OF AUTHORITIES

## CASES

*Aho v. Dep't of Corrections*,
263 Mich. App. 281; 688 N.W.2d 104 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Alexander v. Local 496*,
177 F.3d 394 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242; 106 S. Ct. 2505 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

*Armstrong v. Shirvell*,
596 F. App'x 433 (6th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59-60

*Austin v. Fuel Systems, LLC*,
379 F. Supp. 2d 884 (W.D. Mich. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Bazzetta v. McGinnis*,
430 F.3d 795 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Bacon v. Michigan Cent. R. Co.*,
66 Mich. 166; 33 N.W. 181 (1887) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Bledsoe v. Tenn. Valley Auth. Bd. of Directors*,
42 F.4th 568 (6th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28, 31

*Buckner v. City of Highland Park*,
901 F.2d 491 (6th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40-42

*Burns v. Gadsden State Community College*,
908 F.2d 1512 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Carter v. Western Reserve Psych. Habilitation Ctr.*,
767 F.2d 270 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-45, 49

*Celotex Corp. v. Catrett*,
477 U.S. 317; 106 S. Ct. 2548 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Clayton v. Meijer, Inc.*,
281 F.3d 605 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 261; 105 S. Ct. 1487 (1985) . . . . . . . . . . . . . . . . . . . . . . . . .17, 33, 38-39, 44

*Coburn v. Rockwell Automation, Inc.*,
238 F. App'x 112 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

*DeBoer v. Musashi Auto Parts, Inc.*,
124 F App'x 387 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Dye v. Office of the Racing Com'n*,
702 F.3d 286 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-36

*Ercegovich v. Goodyear Tire & Rubber Co.*,
154 F.3d 344 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Estate of Carter v. City of Detroit*,
408 F.3d 305 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50-51

*Farhat v. Jopke*,
370 F.3d 580 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Fisher v. Detroit Free Press, Inc.*,
158 Mich. App. 409; 404 N.W.2d 765 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

*Garvey v. Montgomery*,
128 F. App'x 453 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

*Geiger v. Tower Auto.*,
579 F.3d 614 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323; 94 S. Ct. 2997 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Harris v. Bornhorst*,
513 F.3d 503 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Hartsel v. Keys*,
87 F.3d 795 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Hildebrant v. Meredith Corp.*,
63 F. Supp. 3d 732 (E.D. Mich. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59-60

*Hollins v. Atlantic Co., Inc.*,
188 F.3d 652 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Ireland v. Edwards*,
230 Mich. App. 607; 584 N.W.2d 632 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . .52-53

*Johnson v. Morales*,
946 F.3d 911 (6th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-39

*Joosberns v. United Parcel Services, Inc.*,
166 F. App'x 783 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30-31

*Kalich v. AT&T Mobility, LLC*,
679 F.3d 464 (6ᵗʰ Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Kubala v. Smith*,
984 F.3d 1132 (6th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Loyd v. Saint Joseph Mercy Oakland*,
766 F.3d 580 (6ᵗʰ Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Lytle v. Malady (On Rehearing)*,
458 Mich. 153; 579 N.W.2d 906 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23

*Majewski v. Automatic Data Processing, Inc.*,
274 F.3d 1106 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574; 106 S. Ct. 1348 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*McCloud v. Testa*,
97 F.3d 1536 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*McDonald v. Santa Fe Trail Transp. Co.*,
427 U.S. 273; 96 S. Ct. 2574 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-27

*McMillan v. Castro*,
405 F.3d 405 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-25

*McPherson v. Kelsey*,
125 F.3d 989 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Meagher v. Wayne State Univ.*,
222 Mich. App. 700; 565 N.W.2d 401 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Miles v. South Central Human Resources, Inc.*,
946 F.3d 883 (6th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1; 110 S. Ct. 2695 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52-54, 59

*Moffat v. Wal-Mart Stores, Inc.*,
624 F. App'x 341 (6th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Morrissey v. Brewer*,
408 U.S. 471; 92 S. Ct. 2593 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Perry v. McGinnis*,
209 F.3d 597 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Prysak v. RL Polk Co.*,
193 Mich. App. 1; 483 N.W.2d 629 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59

*Reighard v. ESPN, Inc.*,
341 Mich. App. 526; 991 N.W.2d 803 (2022) . . . . . . . . . . . . . . . . . . . . . . . . .54-55

*Sawabini v. Desenberg*,
143 Mich. App. 373; 372 N.W.2d 559 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . .52

*Seay v. Tenn. Valley Auth.*,
339 F.3d 454 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

*Smith v. Anonymous Joint Enterprise*,
487 Mich. 102; 793 N.W.2d 533 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 59

*Smith v. Wrigley Mfg. Co., LLC*,
749 F. App'x 446 (6th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*Sniecinski v. Blue Cross & Blue Shield of Mich.*,
469 Mich. 124; 666 N.W.2d 186 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*White v. Duke Energy-Kentucky, Inc.*,
603 F. App'x 442 (6th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24-25

*Withrow v. Larkin*,
421 U.S. 35; 95 S. Ct. 712 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**STATUTES**

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .vi

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .vi

28 U.S.C. § 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .vi

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .vi, 1, 22

**RULES**

FED. R. APP. P. 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .v

FED. R. CIV. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

6 Cir. R. 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .v

## STATEMENT OF CASE

### I.    PROCEDURAL FACTS

On June 23, 2022, Plaintiff, David Hieber, filed the instant cause of action against Defendants, Oakland County and Kyle Jen, alleging: (1) age discrimination in violation of 42 U.S.C. § 1983; (2) age discrimination in violation of the Elliott-Larsen Civil Rights Act; (3) denial of due process in violation of 42 U.S.C. § 1983; (4) political affiliation retaliation in violation of 42 U.S.C. § 1982; and (5) defamation.  (**ECF No. 1, PageID.1-33**).  On June 30, 2022, Hieber filed an amended complaint.  (**ECF No. 4, PageID.65-97**).  On September 12, 2022, Oakland County and Jen filed an answer to the amended complaint.  (**ECF No. 9, PageID.106-130**).

On August 23, 2023, Oakland County and Jen filed a motion for summary judgment.  (**ECF No. 63, PageID.652-694**).  On October 24, 2023, Hieber filed a response to the motion for summary judgment.  (**ECF No. 72, PageID.2305-2342**).  On November 7, 2023, Oakland County and Jen filed a reply brief.  (**ECF No. 73, PageID.3084-3092**).  On March 20, 2024, the District Court held oral arguments on Defendants' motion for summary judgment.  (**ECF No. 88, PageID.3269-3321**).

On March 27, 2024, the District Court entered an opinion and order granting Defendants' motion for summary judgment.  (**ECF No. 78, PageID.3125-3172**).  On the same day, March 27, 2024, the District Court entered judgment in favor of Defendants and against Plaintiff.  (**ECF No. 79, PageID.3173**).  This appeal timely

follows.

## II.    SUBSTANTIVE FACTS

Plaintiff began working for Oakland County in 1994.  (**ECF No. 63-2, PageID.712**).  In the early 2000s, Plaintiff received a promotion to the position of Equalization Manager.  (**ECF No. 63-2, PageID.717**).  Plaintiff's title subsequently changed to Equalization Director.  (**ECF No. 63-2, PageID.717**).  Plaintiff's position was subject to Oakland County's Merit System Rules.  *See* (**ECF No. 72-2, PageID.2345-2450**).  Pursuant to the Merit System Rules, Plaintiff had a "just cause" employment relationship with Oakland County.  *See* (**ECF No. 72-2, PageID.2383**).  Meritt System Rule 8.3 provides, in pertinent part:

> An employee shall receive disciplinary action, whether an oral reprimand, a written reprimand, the withholding of a merit salary increase, a suspension without pay, a demotion, or a dismissal, only for a specific clearly described reason or "cause".

(**ECF No. 72-2, PageID.2383**).

Plaintiff hired into county employment during L. Brooks Patterson's tenure as County Executive.  *See* (**ECF No. 63-2, PageID.712**).  Patterson ran and governed as a Republican.  (**ECF No. 63-2, PageID.824**).  Patterson also formed the Executive Club, which was a fundraising group Plaintiff participated in.  (**ECF No. 63-2, PageID.824**).  In fact, Defendant's Human Resources Department acknowledged that Plaintiff was viewed as part of the Patterson Administration:

Q.     Yes.  Was it your understanding that Mr. Hieber in light of the

> statements that were made here concerning Mr. Hieber wanting UAW attorneys for his defense when having problems with the Coulter Administration, was it your understanding that Mr. Hieber was part of the other administration?
>
> A.   Yes.

(**ECF No. 63-7, PageID.966**).  Plaintiff's employment with Oakland County was uneventful and free from discipline.  In fact, Laurie Van Pelt, former Director of Management and Budget, confirmed in her twenty years of being Plaintiff's supervisor she had never received a complaint about Plaintiff's conduct or behavior. (**ECF No. 63-5, PageID.919**).  Then on August 3, 2019, Mr. Patterson passed away. (**ECF No. 63-4, PageID.873**).

Oakland County replaced Mr. Patterson by appointing David Coulter as County Executive on August 19, 2019.  *See* (**ECF No. 63-4, PageID.873**).  While Patterson was a Republican, Coulter is a Democrat.  (**ECF No. 63-4, PageID.903**). Mr. Coulter had previously served as a Commissioner on the Oakland County Board of Commissioners as a Democrat.  (**ECF No. 63-4, PageID.906**).  A Democratic majority of the Board appointed Mr. Coulter.  (**ECF No. 63-4, PageID.906**).  Soon after ascending to power, the Coulter Administration openly advocated eliminating older, longer-term employees that were associated with the prior administration.  In October 2019, Mr. Coulter hired April Lynch as a Deputy County Executive that oversaw the Human Resources Department.  (**ECF No. 63-9, PageID.991**).  Ms. Lynch made numerous comments demonstrating a bias against older, long-term

employees and created a discriminatory atmosphere. For instance, when the Coulter Administration hired Ms. Lynch, the Human Resources Director was Jordie Kramer. (**ECF No. 72-9, PageID.2537**). Ms. Kramer had twenty plus years of employment with Oakland County. (**ECF No. 72-9, PageID.2536**). Within thirty days of Mr. Coulter assuming office, Ms. Lynch had asked Ms. Kramer to leave her employment. (**ECF No. 72-9, PageID.2543**). In that short time, Ms. Kramer was confronted with clear evidence of age bias as Ms. Lynch would refer to two older female employees as "grandmas." (**ECF No. 72-9, PageID.2539**).

After Ms. Kramer left her employment, Jennifer Hain, Human Resources Manager, began directly reporting to Ms. Lynch. (**ECF No. 72-8, PageID.2529**). Like Ms. Kramer, Ms. Hain heard on numerous occasions Ms. Lynch express bias towards older employees. *See* (**ECF No. 72-8, PageID.2529-2530**). Ms. Hain explained that Ms. Lynch would refer to her prior experience during her employment with the City of Ferndale and Ms. Lynch would explain how there was "dead wood" at the city and people had been there way to long; she had to clean house and hire all new people. (**ECF No. 63-11, PageID.1032**). Soon those comments began to refer to people employed by Oakland County as Ms. Lynch would state that she had "more dead wood to clean up around here." (**ECF No. 63-11, PageID.1032**). Ms. Lynch would also state that "there's a lot of people here that have . . . been there a long time and it's way too long." (**ECF No. 63-11, PageID.1033**). On multiple

occasions, Ms. Hain heard Ms. Lynch refer to older employees as "old timers" or "dead wood."  (**ECF No. 63-11, PageID.1037**).  Ms. Lynch would refer to a group of older employees as a "dead wood" and then indicate she intended on getting rid of them "one way or another."  (**ECF No. 63-11, PageID.1038**).  Ms. Hain also noted a pattern of behavior in which Ms. Lynch would eliminate older, tenured employees, like Ms. Kramer, and replace them with substantially younger, less experienced individuals.  (**ECF No. 72-8, PageID.2530**).  Ms. Hain's testimony continued:

> Like, she'd mention, again, you know, staff meeting with me and myself and the other division managers, you know, Oh, got to get some dead wood out of here.  This VESIP program is going to help.

(**ECF No. 63-11, PageID.1033**).

The "VESIP" refers to Oakland County's Voluntary Early Separation Incentive Program.  *See* (**ECF No. 64-5, PageID.1138**).  On November 12, 2020, Ms. Lynch sent a memorandum to the Finance Committee and the Board of Commissioners regarding the implementation of the above program.  (**ECF No. 64-5, PageID.1137**).  In describing why the initiative was "important," Ms. Lynch suggested that it would generate a younger workforce; Ms. Lynch stated:

> Finally, it will enable us to prepare a workforce for the future; one that is competitive, nimble and reflective of the diversity of our county.

(**ECF No. 64-5, PageID.1137**).  This statement when viewed in light of the rest of the memorandum, which discusses how the County had over 900 employees that

would be eligible for employment in the next five years, implies that the older, long-term employees do not constitute a "workforce for the future" and one that is not "nimble."[1]  (**ECF No. 64-15, PageID.1137**).  The VESIP was approved and went into effect December 7, 2020.  (**ECF No. 64-5, PageID.1138-1139**).  Plaintiff did not participate in the incentive program.

On October 7, 2020, Bryan Paris, Field Supervisor in the Equalization Department, sent an email to Julie Fisher, Human Resources Manager, Ms. Lynch, and Sean Carlson, Deputy County Executive.  (**ECF No. 72-3, PageID.2451-2452**).  In said email, Mr. Paris claimed that Plaintiff engaged in discriminatory behavior on September 1, 2020.  (**ECF No. 72-3, PageID.2451**).  On said date, Plaintiff received a text message from his daughter during a supervisor's meeting, in which his daughter related that her math teacher asked in a survey what the student's pronouns were; Plaintiff questioned out loud why the teacher could not just refer to his daughter by her name and focus on math.  *See* (**ECF No. 72-3, PageID.2451**); (**ECF No. 72-4, PageID.2460**); (**ECF No. 63-2, PageID.729**).  Mr. Paris, who identifies as gay, took offense at the comment, which was not directed at anyone.  Mr. Paris continued to accuse Plaintiff of discriminating against individuals based on age, sex, race, and gender, but did not give any factual basis for such an accusation.  (**ECF**

---

[1] Demonstrating Ms. Lynch's use of "nimble" as code word for "younger," and despite the fact that she used the word in her memorandum, Ms. Lynch denied knowing what the word "nimble" means.  (**ECF No. 63-9, PageID.996**).

No. 72-3, PageID.2451-2452). Most importantly, Mr. Paris directly tied his complaint to the fact that he viewed Plaintiff as having different political views, Plaintiff's association with the "former administration," and an upcoming election. (**ECF No. 72-3, PageID.2452**). Mr. Paris wrote:

> Mr. Hieber's bullying is a long-standing problem that has endured because he has been protected by members of the former administration, and I believe there are remnants of that administration remaining within Oakland County HR today.[2] We are within days of an election in which the administration could change and once again the county could be under leadership of individuals that do not believe that a diverse and inclusive environment, which is free of harassment and bullying, best represents and serves Oakland County taxpayers.

(**ECF No. 72-3, PageID.2452**).

On October 13, 2020, Ms. Fisher notified Mr. Paris that Rosie Wood, Senior Employee & Labor Relations Specialist had been assigned to investigate his complaint. (**ECF No. 72-3, PageID.2451**). Mr. Paris' complaint was actually investigated by Ms. Wood and Tim Sutherland of Risk Management. *See* (**ECF No. 72-4, PageID.2453**). On January 7, 2021, Ms. Wood and Mr. Sutherland submitted a memorandum to Ms. Fisher regarding their investigation. *See* (**ECF No. 72-4, PageID.2453**). The investigation found Mr. Paris' complaint to be unsubstantiated:

> Based on the interviews with the employees identified in the complaint as potential witnesses, there does not appear to be validity in the claims of discriminatory behavior from Dave Hieber towards Equalization staff. The comment made by Hieber in the September 1, 2020 zoom

---

[2] This comment suggests that Oakland County staff were aware of efforts to purge county employment of those associated with the "former administration" and that those efforts had not been completed at that time.

meeting, although perceived as out of place, causing a sense of awkwardness; seemed to be an isolated incident and not intentionally directed at anyone. The description of Equalization being a corrosive and fear-based environment was not substantiated.

(**ECF No. 72-4, PageID.2461**).

Several months later, employees in the Equalization Department had unionized. *See* (**ECF No. 63-6, PageID.942**). Soon after the department unionized, Mr. Paris continued his politically motivated attack against Plaintiff and sought the union's help in removing Plaintiff from County employment. On October 18, 2021, Mr. Paris wrote to Joe Rozell of Local 889 UAW. (**ECF No. 72-13, PageID.2633-2634**). In the email, Mr. Paris stated that his intent was to file a grievance against Plaintiff "due to his continued behavior that creates a hostile work environment meant to discriminate against vulnerable people. . . ." (**ECF No. 72-13, PageID.2633**). Mr. Paris claimed that Plaintiff had violated the County's Non-Discrimination Policy. (**ECF No. 72-13, PageID.2633**). Mr. Paris then referenced his October 2020 complaint against Plaintiff and forwarded a copy of his prior unsubstantiated complaint with its reference to the remnants of the prior, Republican administration, an upcoming election, and his false perception that Plaintiff did not believe in "a diverse and inclusive environment." (**ECF No. 72-13, PageID.2633-2634**). The only substance to his complaint was a hearsay report that other unidentified employees had told him that Plaintiff "was openly bashing the Diversity, Equity and Inclusion survey," but failed to provide any details of what

was allegedly said.  (**ECF No. 72-13, PageID.2633-2634**).  Mr. Paris also made no

secret as to his desired outcome; he wrote:

> As Dave has proven that he is incapable of refraining from behavior
> that seeks to create a hostile and discriminatory workplace, I seek the
> unions help in removing David Hieber from Oakland County's
> employment.

(**ECF No. 72-13, PageID.2634**).  On the same date, October 18, 2021, Mr. Rozell

forwarded the email to Ms. Fisher, who even though Mr. Paris' email had no real

substance and was based upon hearsay, appeared to immediately believe the

accusation prior to any investigation.  *See* (**ECF No. 72-13, PageID.2633**).  Ms.

Fisher responded:

> You have no idea how disappointing, and quite frankly, disturbing this
> is to read.
>
> I assure you Labor Relations takes this matter very seriously and will
> begin an investigation.  As this employee states, there is a history of
> Dave being perceived as intimidating.  I ask for your support with these
> employees in letting them know that we will create a safe environment
> for them to share their experiences.

(**ECF No. 72-13, PageID.2633**).  Ms. Fisher's statement does not make sense

considering her knowledge that the history of Plaintiff being perceived as

intimidating was unsubstantiated and disproven by the prior investigation, nor does

she share that information with the union officials.

Mr. Paris' second complaint was investigated by Ms. Wood and Mr.

Sutherland again.  (**ECF No. 63-6, PageID.941**).  According to Oakland County, the

investigation involved interviewing eleven employees from the Equalization Department and gathering statements and records. (**ECF No. 64-15, PageID.1352**). Defendants, however, have only produced and made part of the record interviews of nine employees, including Plaintiff, and has never produced any written employee statements. *Compare* (**ECF No. 64-15, PageID.1352**) *with* (**ECF Nos. 64-7 through 64-14**). On October 21, 2021, Rob Doyle, an Equalization Department employee and union official, sent an email to Ms. Wood, which referenced two incidents relating to the unionization attempts, as an apparent attempt to corroborate Mr. Paris' complaint about the cultural survey. *See* (**ECF No. 72-11, PageID.2553**). Mr. Doyle falsely alleges that on October 13, 2021, Plaintiff had brought up the topic of the cultural survey in a conversation between Mr. Doyle and Alex McLeod. (**ECF No. 72-11, PageID.2553**). Mr. Doyle falsely attributes to Plaintiff that statement, "If my boss Kyle Jenn asked me about it, I will just lie and say I did it, I don't care." (**ECF No. 72-11, PageID.2553**). Mr. McLeod, however, told an inconsistent story to investigators, raising significant question whether Mr. Doyle's allegation was fabricated, claiming Plaintiff stated he would downplay the strength of his feelings considering his concern that the survey was not really anonymous; Mr. McLeod reported:

> "[A]t a certain point after we talked about how anonymous the survey actually was, you know he commented himself on the survey and said that uhm, he hadn't take it, uhm, at that time, he didn't plan to uhm, you know, he, he, he made a comment regarding that he, he would lie about

either, he either said it regarding he would lie about taking it one way or another or he would lie about uhm the questions you know and, and and you know, how you can take the survey and just go agree, I don't agree, disagree, whatever, uhm he wasn't going to put any strong feelings one way or another is how I perceived it.

(**ECF No. 64-7, PageID.1147-1148**).

On October 21, 2021, Plaintiff received a text message from Kyle Jen, Director of Management and Budget, Plaintiff's immediate supervisor, asking Plaintiff to stop by his office at 4:30 to discuss "an HR matter." (**ECF No. 72-15, PageID.2710**). At 4:00 p.m., however, Plaintiff learned that Ms. Fisher was present at his office waiting to meet with him. (**ECF No. 63-2, PageID.750-751**). When Plaintiff went up front to greet her, he saw her present with Ms. Wood and two plainclothes deputies "with their badges on lanyards around their neck and their firearms clear." (**ECF No. 63-2, PageID.753**). When meeting with Ms. Fisher, Plaintiff received a letter providing notice that he was being placed on paid administrative leave, effective immediately. (**ECF No. 64-16, PageID.1358**). The letter further advises Plaintiff to have no contact with any subordinate employees, to not conduct any County business, and to not come on any county property. (**ECF No. 64-16, PageID.1358**). When Plaintiff asked why he was being placed on administrative leave, Ms. Fisher advised it had to do with "shifting union work" and comments on the cultural survey, without further detail. (**ECF No. 63-2, PageID.753**). To further embarrass Plaintiff, who had no prior disciplinary history

or history of posing a danger or threat to anyone, Plaintiff was walked to the door by the two deputies and to his vehicle by one of the deputies.  (**ECF No. 63-2, PageID.753**).

The following day, October 22, 2021, Defendant Jen defamed Plaintiff to the Equalization Department, attempting to make Plaintiff appear as if he presented a physical danger to employees and encouraging staff to come forward with more complaints against Plaintiff, trying to obtain additional fabricated bases to justify taking action against Plaintiff.  *See* (**ECF No. 72-17, PageID.2712-2713**). Defendant Jen notes that the email was to "provide an update in writing to the full team so everyone has clarity on a few key things while Dave Hieber is on leave." (**ECF No. 72-17, PageID.2712**).  Defendant Jen notes changes to security protocols for the department to follow, implying that there was a need to do so due to a threat posed by Plaintiff:

> All employees have been advised to work from home today and Monday.  As employees return onsite Tuesday based on operational needs, be advised that you must park in the public parking lot at the front of the building and enter/exit building through the main entrance only.  This will continue until further notice.

(**ECF No. 72-17, PageID.2712**).  Defendant Jen continues to state it was his goal to ensure "employees work in a safe environment free of intimidation, coercion, harassment, retaliation, or discrimination," implying Plaintiff's presence comprised that work environment.  (**ECF No. 72-17, PageID.2712**).  Finally, Defendant Jen

encouraged employees to come forward with complaints and insisted they would be protected by the Whistleblowers' Protection Act.  (**ECF No. 72-17, PageID.2712**).

Emboldened by Defendant Jen's email, Mr. Paris continued his politically motivated attack on Plaintiff.  On October 26, 2021, Mr. Paris wrote County Executive Coulter directly.  (**ECF No. 72-18, PageID.2714**).  Mr. Paris clearly wrote the email to demand Plaintiff's termination and requested an in-person meeting with Mr. Coulter.  (**ECF No. 72-18, PageID.2714**).  Mr. Paris began the email misrepresenting his prior complaint, stating Plaintiff had "openly mocked a 'getting to know you survey' in a meeting of supervisors due to the survey's content regarding gender identity."  (**ECF No. 72-18, PageID.2714**).  He then accused Plaintiff of having a political agenda against Diversity, Equity, and Inclusion and confirmed the defamatory implications of Defendant Jen's email:

> David Hieber has not made it a year past his training without promoting his discriminatory agenda openly amongst staff by deriding the Diversity, Equity and Inclusion Survey, and quite frankly, I am not surprised.  When I met with Rosie and Tim, I recall them asking me a question along the lines of what I would like to see happen and my response was that things will not change as long as David Hieber remains at Equalization.

> Conditions did not improve in Equalization, and I fear that they will further erode once Dave returns with a slap on the wrist for his repeated bad behavior.  I have never discussed my fear of Dave's physical retaliation towards me; however, I cannot help but believe that the administration has these concerns given the necessary security protocols I must follow when I return to the campus today.

(**ECF No. 72-18, PageID.2714**).

On November 12, 2021, Plaintiff met with his attorney, Nakisha Chaney, Ms. Wood, and Daniel Klemptner, Chief of Labor and Employee Relations at the Sheriff's office. (**ECF No. 63-2, PageID.757-758**). During the meeting, Mr. Klemptner interviewed Plaintiff on several subjects; however, Plaintiff had not received notice of the allegations against him, or a summary of the evidence Defendant possessed prior to the meeting. *See* (**ECF No. 64-18, PageID.1363-1390**); (**ECF No. 63-2, PageID.757-760**). On November 22, 2021, Ms. Fisher provided Plaintiff, through counsel, a letter enclosing a Notice of Intent to Dismiss. (**ECF No. 64-15, PageID.1351-1353**). The letter further advises Plaintiff that a virtual pre-termination hearing was scheduled for the following day. (**ECF No. 64-15, PageID.1351**). The Notice of Intent to Dismiss informed Plaintiff that "Executive Administration" had requested his immediate dismissal for engaging in conduct that "demonstrates a deliberate attempt to cause poor morale or disrespect among County employees by actions or attitude on the job" and willfully violating the Non-Discrimination Policy. (**ECF No. 64-15, PageID.1352**). The Notice consists of four issues. First, the Notice accuses Plaintiff of creating a "hostile work environment" and charges Plaintiff with making seven statements without providing any context, when they allegedly were made, and who accused him of making those statements. (**ECF No. 64-15, PageID.1352**). Second, the Notice references Mr. Paris' 2020 complaint, but fails to note that the complaint was not substantiated, and

it was determined Plaintiff had not violated the Non-Discrimination Policy.  (**ECF No. 64-15, PageID.1352**).  Third, the Notice accuses Plaintiff of stating he would lie if asked if he completed the cultural survey, a statement Plaintiff denied making and where a witness had described the statement quite differently than the version used by Defendants.  (**ECF No. 64-15, PageID.1353**).  Lastly, the Notice accuses Plaintiff of making statements about unionization negotiations, which are false and do not make sense since Plaintiff had attempted to join the union.  (**ECF No. 64-15, PageID.1353**).

On November 22, 2021, Plaintiff's attorney, Ms. Chaney, corresponded via email with Ms. Wood.  (**ECF No. 72-20, PageID.2723**).  In one email, Ms. Wood misrepresented what transpires at a pre-termination hearing, falsely stating that the hearing was just to provide notice and stating it was not Plaintiff's time to respond to the allegations.  (**ECF No. 72-20, PageID.2723**).  Ms. Wood stated:

> The hearing that is taking place is brief, to inform Mr. Hieber of the notice of being terminated and to provide the departments cause.
>
> Also, this is not the time that Mr. Hieber would plead his case, that would be done afterward through the Personnel Appeal Board.

(**ECF No. 72-20, PageID.2723**).  This misrepresentation was not a one-off comment by Ms. Wood; Ms. Fisher repeated the same statement during the pre-termination hearing.

On the following day, November 23, 2021, Plaintiff participated in the pre-

termination hearing. *See* (**ECF No. 64-20, PageID.1404-1410**). During the hearing, Ms. Fisher noted that the purpose was "to acknowledge that the employee received the intention of the department to terminate employee employment." (**ECF No. 64-20, PageID.1407**). Mr. Jen read a statement of the bases for Plaintiff's termination, noting the two Merit System Rules mentioned in the Notice of Intent to Dismiss. (**ECF No. 64-20, PageID.1407-1408**). When asked if he had a statement, Plaintiff responded:

> I deny the charged rule violation. I was informed that the termination was a predetermined outcome of this meeting, and I was notified in writing that this was not the time to plead my case.

(**ECF No. 64-20, PageID.1408**). Ms. Chaney questioned and reiterated that Plaintiff was told "that today would not be the opportunity to plead his case." (**ECF No. 64-20, PageID.1409**). Ms. Fisher repeated what Ms. Wood explained and explained the meeting was solely to give notice:

> Yeah. That is correct. So this is an employment meeting. Right. So if he challenges, wants to challenge the action being taken, he has the right to do that through the Personnel Appeal Board. Today's meeting is just to make sure that he is aware of the action being taken and understands the reason why, not necessarily that he agrees or disagrees with anything.

(**ECF No. 64-20, PageID.1409**). Ms. Fisher finished the meeting at 4:11 p.m., indicating that would render her decision by tomorrow and notify Plaintiff in writing. (**ECF No. 64-20, PageID.1409-1410**). Seventeen minutes later, however, at 4:28 p.m., Ms. Fisher wrote Ms. Chaney indicating that she was rendering a decision at

that time.  (**ECF No. 72-11, PageID.2724**).  Ms. Fisher wrote, confirming her view

of the *Loudermill* hearing as providing notice only:

> The intent of this hearing was to ensure Mr. Hieber knew what action
> was being proposed.  Mr. Hieber stated he understood.  Therefore, I am
> upholding the proposed action of termination.

(**ECF No. 72-11, PageID.2724**).  Prior to Plaintiff's dismissal, he never received

any of the evidence Oakland County possessed, such as the audio recordings or

transcripts of the interviews, nor did he receive a summary of the evidence indicating

who accused him of saying various statements at unidentified times.

On November 24, 2021, Defendant Jen continued to defame Plaintiff, falsely

implying that he posed a physical threat to employees.  *See* (**ECF No. 64-23,

PageID.1421-1422**).  Defendant Jen sent an email to the entire Equalization

Department, advising that Plaintiff's employment had ended.  (**ECF No. 64-23,

PageID.1421**).  He then noted that Plaintiff had been instructed not to contact staff

"as there is no business reason to do so."  (**ECF No. 64-23, PageID.1421**).  He

further stated that Plaintiff had been advised to refrain from coming to the county

offices.  (**ECF No. 64-23, PageID.1421**).  Defendant Jen then solicited staff to take

notes of any contact Plaintiff has with them and for them to report the contact to

Human Resources.  (**ECF No. 64-23, PageID.1421**).  Next, he advises staff to call

9-1-1 if Plaintiff appeared on site.  (**ECF No. 64-23, PageID.1421**).  Unnecessarily

stoking fears amongst staff, Defendant Jen then implied Plaintiff might come to their

homes and advises that if he did so, employees should call 9-1-1. (**ECF No. 64-23, PageID.1422**).

Plaintiff timely appealed his dismissal to the Personnel Appeal Board. *See* (**ECF No. 64-24, PageID.1424-1426**). The PAB hearing was subsequently scheduled for January 28, 2022. *See* (**ECF No. 64-25, PageID.1428**). According to Defendant's Merit System Rules, the PAB is composed of six members. (**ECF No. 72-2, PageID.2390**). On January 20, 2022, Ms. Fisher wrote to Ms. Lynch that Plaintiff's PAB hearing would occur on January 28, 2022 and the Board members would be Commissioner David Woodward, Barry Lepler, and Gloria Harsten-Spann. (**ECF No. 72-24, PageID.2799**). Ms. Lynch forwarded Ms. Fisher's email to Hilarie Chambers, Chief Deputy County Executive, and Mr. Coulter. (**ECF No. 72-24, PageID.2799**). Ms. Chambers replied, "Barry Lepler! He is one of my besties!!" creating significant concern about Mr. Lepler's independence and the Coulter Administration's ability to affect the outcome of the PAB. (**ECF No. 72-24, PageID.2799**). It became increasingly clear that Plaintiff would not be receiving a fair and impartial hearing. On January 12, 2022, Plaintiff's counsel notified Mr. Klemptner of the eleven witnesses he planned on calling as part of the PAB hearing and the potential need to present some of the witness's testimony by affidavit. (**ECF No. 72-27, PageID.2913-2914**). Plaintiff's counsel also made requests for various documents, including any of the complaints filed and any investigative report. (**ECF**

No. 72-27, PageID.2913-2914).  Plaintiff did not receive the requested documents. On January 17, 2022, Plaintiff's counsel again spoke with Mr. Klemptner, notifying him that the witnesses employed by Oakland County had not been notified that they could speak with Plaintiff, which was extremely important in light of Defendant Jen's emails.  (**ECF No. 72-27, PageID.2915**).  On January 20, 2022, Plaintiff's counsel again reported to Mr. Klemptner concerns about witness's cooperation, quoting language from the separation agreements witnesses who had retired had signed, which prohibited them from disparaging or criticizing the County or its management or practices.  (**ECF No. 72-27, PageID.2917**).  On January 24, 2022, Plaintiff's counsel twice reached out, requesting an update about the requested documents and confirmation that Plaintiff's witnesses would be cooperating.  (**ECF No. 72-27, PageID.2918-2919**).

On January 28, 2022, the PAB convened a hearing on Plaintiff's appeal.  *See* (**ECF No. 64-25, PageID.1428**).  Before the hearing could get underway, corporation counsel raised an objection to affidavits submitted by Plaintiff's counsel. (**ECF No. 64-25, PageID.1435**).  Prior to giving Plaintiff an opportunity to respond, Chairman Woodward decided to recess the hearing "to discuss the appropriate process and procedures and consult on how to make a decision for the Chair to rule." (**ECF No. 64-25, PageID.1437**).  The stated purpose was to engage in discussion and decision making, behind closed doors, off the record.  (**ECF No. 64-25,**

**PageID.1437**).  Upon reconvening the hearing, Chairman Woodward indicated that he would deny accepting any affidavits.  (**ECF No. 64-25, PageID.1437**).  Ms. Fisher, however, testified that affidavits are allowed and permissible at a PAB hearing.  (**ECF No. 63-6, PageID.950**).  Moments later, corporation counsel misrepresented on the record that the Board had "no subpoena power for these proceedings."  (**ECF No. 64-25, PageID.1442**).  This is directly contradicted by Oakland County Merit System Rule 11.5.1, a rule governing the conduct of PAB hearings, which provides, "The Board may subpoena witnesses and records as it finds necessary."  (**ECF No. 72-2, PageID.2395**); *see also* (**ECF No. 63-6, PageID.950**).  Plaintiff further raised the issue that he had still not been provided with the requested documents or any of the witness statements:

> We had asked for documents; we had asked for multiple documents. We never got anything.  We don't have any of the statements that were taken by HR of these witnesses that they intend to call.  I mean we don't have anything, and so this is – I – I look at it as being unfair at this point. . . .

(**ECF No. 64-25, PageID.1339-1440**).  While Plaintiff's due process rights were being overlooked, the parties attempted to negotiate a settlement of Plaintiff's claims.  After Chairman Woodward, who oversaw the PAB hearing, prevented a proposed settlement and the County identified Plaintiff's replacement, it became clear that the PAB hearing was a sham and did not provide Plaintiff with a legitimate hearing to appeal his dismissal and, as such, Plaintiff chose to file suit.

# ARGUMENT

## II.    STANDARD OF REVIEW

This Court reviews a district court's grant or denial of summary judgment *de novo*.  *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 469 (6th Cir. 2012).   In conducting such a review, this Court must accept "all of the nonmovant's evidence as true and draw all reasonable inferences in the nonmovant's favor."  *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014).  A court should grant a motion for summary judgment only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Accordingly, when a party seeks summary judgment on a claim it does not bear the same burden of proof as at trial; it can satisfy its burden by "pointing out to the [] court . . . that there is an absence of evidence to support [the non-moving party's] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325; 106 S. Ct. 2548 (1986).  If the moving party can satisfy this burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587; 106 S. Ct. 1348 (1986).  The Court must then determine whether the evidence presents a sufficient dispute to require submission of the non-moving party's claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252; 106 S. Ct.

2505 (1986).  To find a material factual dispute:

> [The issue] is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing version of the truth at trial.

*Anderson*, 477 U.S. at 248-249.  At this stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter."  *Id*. at 249.  At the same time, summary judgment "is generally not well suited for cases in which motive and intent are at issue."  *Perry v. McGinnis*, 209 F.3d 597, 600-601 (6th Cir. 2000); *see also Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 348 (6th Cir. 2015)("[A]n employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage.").

## II.   THAT THE DISTRICT COURT ERRED IN FAILING TO FIND A FACTUAL DISPUTE REGARDING PLAINTIFF'S AGE DISCRIMINATION CLAIMS

Plaintiff claimed age discrimination in violation of 42 U.S.C. § 1983 and the Michigan Elliott-Larsen Civil Rights Act.  Both claims are subject to the same analysis under the *McDonnell Douglas* burden-shifting analysis.  *See Burns v. Gadsden State Community College*, 908 F.2d 1512, 1518 (11th Cir. 1990); *Geiger v. Tower Auto.*, 579 F.3d 614, 626 (6th Cir. 2009).  To establish a *prima facie* case of age discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment

action; and (4) he suffered the adverse action under circumstances that give rise to an inference of unlawful discrimination. *Lytle v. Malady (On Rehearing)*, 458 Mich. 153, 172-173; 579 N.W.2d 906 (1998). A plaintiff may establish the fourth element through evidence that he was replaced by someone outside the protected class or that he was treated differently than similarly situated individuals outside the protected class. *Smith v. Wrigley Mfg. Co., LLC*, 749 F. App'x 446, 448 (6th Cir. 2018). Both the District Court and Defendants focused solely on Plaintiff's ability to establish the fourth element of his *prima facie* case.

Plaintiff sought to establish the fourth element through comparison of how Defendants treated Plaintiff versus how Defendants treated the substantially younger, Paris. Defendants' sole comment about such an argument in their motion was limited to one sentence, "There is also no record evidence that anyone engaged in conduct similar to that which was the basis of Plaintiff's termination but was not terminated." (**ECF No. 63, PageID.677**). In their reply brief, Defendants' argued that the comparison was not appropriate for three reasons: (1) they did not share the same supervisor; (2) they were subjected to different work standards without identification of any standards that differed for the two employees;[3] and (3) the discipline of Plaintiff was "premised in part on myriad offensive comments" and not

---

[3] Defendants made no effort to expound upon this argument and did not identify the purported different work standards that are applicable. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997).

a "one-off comment to Young." (**ECF No. 73, PageID.3086**).  The District Court analyzed the third argument made by Defendant and concluded that the comparison was improper.  However, the District Court's analysis is confusing as it is premised upon a comparison of a complaint Ashley Young made against Mr. Paris and the 2020 complaint Mr. Paris made against Hieber, which Oakland County found was unsubstantiated.  Moreover, the District Court ignored the fact that much of the "hostile work environment" used to justify Plaintiff's termination directly arose from the fact that Oakland County treated Plaintiff differently.  Oakland County did not solicit complaints about Mr. Paris and interview other employees to see if there was a pattern of behavior, which is part and parcel of the disparate treatment.  Simply put, Defendant is seeking to benefit from its disparate treatment to justify its disparate treatment.

To establish that a comparator is similarly situated, a plaintiff need not demonstrate an exact correlation between himself and the employee receiving more favorable treatment.  *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 480 (6th Cir. 2003). Courts should make an independent determination as to the relevancy of the particular aspects of the comparator's status; the comparators need only be similar in all the "relevant aspects."  *White v. Duke Energy-Kentucky, Inc.*, 603 F. App'x 442, 447-448 (6th Cir. 2015).  In relation to the "same supervisor" requirement, it "has never been read as an inflexible requirement."  *Id*. at 448 (quoting *McMillan v.*

*Castro*, 405 F.3d 405, 414 (6th Cir. 2005)).  In *White*, the Sixth Circuit permitted a member of management to compare himself with non-management employees, based upon the fact that none of the policies cited in the decision to terminate appeared to make any meaningful distinction between management and union employees and the plaintiff contested whether his managerial status was relevant to the comparison.  *Id*. at 448-450.

Defendants accused Plaintiff of willfully violating Oakland County's Non-Discrimination Policy.  (**ECF No. 64-15, PageID.1352**).  The accusation stemmed from a single comment reported by Mr. Paris, on October 18, 2021, and by Mr. Doyle, on October 21, 2021, about Plaintiff criticizing a cultural survey.  (**ECF No. 64-6, PageID.1143**); (**ECF No. 72-11, PageID.2553**).  Prior to Plaintiff's dismissal, Ms. Young, a Real Estate Appraiser, had complained to Ms. Fisher via email about a discriminatory comment Mr. Paris made to her and subsequently met with Ms. Fisher and another woman.  (**ECF No. 72-31, PageID.3053**).  Ms. Young, who identifies as bisexual, testified:

> Q.    And what was the complaint that you made?
> A.    Bryan Paris made a comment to me, and it was a derogatory comment regarding my sexuality.
> Q.    What was the comment?
> A.    We were discussing the fact that when I started at the Equalization Division I was married to a woman, and I since got divorced and I was then dating a man.  And he said I really don't understand you bisexuals.
> Q.    Okay.  And that's a common discriminatory trope against bisexuality, is, pick a team, choose who you like that kind of

stuff, right?

A.     Yes.

(**ECF No. 72-31, PageID.3053**).  Ms. Fisher told Ms. Young that they would look into the issue, but Ms. Young never heard anything else.  (**ECF No. 72-31, PageID.3055-3056**).  While Mr. Paris' discriminatory comment violated the Non-Discrimination Policy, Oakland County did not conduct an investigation and did not issue any discipline.  Nevertheless, the Non-Discrimination Policy applies to all employees, regardless of whether the employee is a member of management or a union. *See* (**ECF No. 63-14, PageID.1059**).  Different standards do not apply based upon whether someone is a member of management or not.[4]  Neither Defendant nor the District Court demonstrated that the supervisor who Hieber and Paris reported to was material to the comparison.

Regarding the comparison of Plaintiff's and Mr. Paris' conduct, the District Court erred in determining that their conduct differed in severity such that they were inappropriate comparators.  A plaintiff must show that the person to whom he seeks to compare himself "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002). In other words, the conduct must be "of comparable seriousness." *McDonald v.*

---

[4] It should be noted that Mr. Paris also supervised employees and, at times, supervised Ms. Young.

*Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n. 11; 96 S. Ct. 2574 (1976). The District Court compared Mr. Paris' discriminatory statement made to Ms. Young to the entire investigation of Plaintiff, including the unsubstantiated 2020 investigation and the 2021 investigation that led to his dismissal. This reasoning is based on a faulty premise, because it is based upon the results of an investigation which Oakland County conducted against Mr. Hieber, prompted by one comment, while Oakland County failed to investigate Ms. Young's complaint against Mr. Paris. In other words, Defendants and the District Court seek to give Oakland County a benefit from the disparate treatment. Defendants treated Plaintiff differently and then used the results of the differing treatment to justify that disparate treatment after-the-fact. This is improper, because had Oakland County truly investigated Ms. Young's complaint and treated Mr. Paris similarly to Plaintiff, the investigation would have uncovered additional complaints about Mr. Paris. For instance, Angie Kurmas, who had submitted a letter of resignation, followed up on that letter, setting forth the reasons behind her decision to resign. *See* (**ECF No. 72-33, PageID.3080-3083**). In the email, Ms. Kurmas noted how she had previously reported Mr. Paris' behavior and complained that Paris "was behaving in an aggressive and confrontational manner that was unwarranted and inappropriate for the workplace." (**ECF No. 72-33, PageID.3080**). Had Defendants investigated Ms. Young's complaint, it would have received additional complaints about Mr. Paris' behavior.

The comparison is appropriate for several reasons.  First, the 2021 complaint made by Mr. Paris against Mr. Hieber accused Mr. Hieber of making one derogatory statement regarding the cultural survey, while Ms. Young's complaint against Mr. Paris accused Mr. Paris of making a discriminatory comment about her sexual orientation.  Although both complaints involve the same Non-Discrimination Policy, which applies equally to all employees, Oakland County investigated Mr. Paris' complaint but failed to investigate Ms. Young's complaint.  Oakland County solicited complaints and interviewed other members of the Equalization Department following Mr. Paris' complaint but did neither following Ms. Young's complaint. Oakland County issued discipline to Plaintiff because of Mr. Paris' complaint, but did not issue any discipline to Mr. Paris due to Ms. Young's complaint.  Defendants treated the two situations differently without justification and such evidence is sufficient to raise a question of fact whether Defendants treated Plaintiff differently than a substantially younger comparator.  *Bledsoe v. Tenn. Valley Auth. Bd. of Directors*, 42 F.4th 568, 586 (6th Cir. 2022)("Whether the comparison between similarly situated individuals is sufficiently relevant is itself a jury question.").

The District Court did not analyze the remaining elements of Plaintiff's age discrimination claims.  (**ECF No. 78, PageID.3150**).  To the extent this Court evaluates the remaining elements, the record evidence further supported a factual dispute regarding the issue of pretext.  Once the plaintiff has presented a *prima facie*

case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action. *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 469 Mich. 124, 134; 666 N.W.2d 186 (2003). If the defendant articulates such a reason, the burden shifts to the plaintiff to show that the defendant's proffered reason was not the true reason, "but was only a pretext" for the dismissal. *Aho v. Dep't of Corrections*, 263 Mich. App. 281, 289; 688 N.W.2d 104 (2004). A plaintiff may show pretext by demonstrating the proffered reason: (1) has no basis in fact; (2) did not actually motivate the decision; or (3) was too insufficient to warrant the action taken. *Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 711-712; 565 N.W.2d 401 (1997). These are not the only ways a plaintiff can establish pretext, but are simply a "convenient way of marshalling evidence and focusing on the ultimate inquiry," which asks whether the defendant took the adverse action "for the stated reason or not?" *Miles v. South Central Human Resources, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020).

First, a question of fact exists whether Defendants' articulated reason for Plaintiff's dismissal is based in fact. Plaintiff denied making the statements falsely attributed to him. *See* (**ECF No. 64-18, PageID.1363-1390**); (**ECF No. 64-20, PageID.1408**); (**ECF No. 63-2, PageID.745-747, 749, 816**). The record does not contain any explanation as to why Defendants believed the individuals interviewed over Plaintiff. To evaluate who was telling the truth, Defendants would necessarily

have to rely upon the content of the statements; those statements from the interviewees, however, are hearsay and to rely on those statements for anything other than the fact that they were made is impermissible. *See Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996). Defendants cannot invoke the honest belief rule when based upon facts that are inadmissible hearsay. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)(requiring employer to invoke the honest belief rule where employer "reasonably relied" on "particularized facts"). Without reliance on the honest belief or business judgment rule, there remains a factual dispute as to whether Plaintiff made the statements alleged. Moreover, a jury can still evaluate the reasonableness of the employer's business judgment. *See* M Civ JI 105.03. This is important, because Defendants rely upon information that was unsubstantiated in the 2020 investigation and many of the witnesses in the 2021 interviews failed to report much of what they reported in 2021 the year prior, raising a question as to the veracity of the claim and whether there was an orchestrated effort between a certain group of individuals, union leadership, and the Coulter Administration to rid Oakland County of Plaintiff.

Plaintiff can also establish a factual dispute through the evidence that Defendants treated Mr. Paris disparately as argued above. This Court has found that evidence establishing pretext under the third method:

> ordinarily consists of evidence that other employees . . . were not fired
> even though they engaged in substantially identical conduct to that

which the employer contends motivated its discharge of the plaintiff. *Joosberns v. United Parcel Services, Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006). As argued above, Defendants failed to investigate and discipline Mr. Paris for his discriminatory comment to Ms. Young; however, Defendants investigated and discharged Plaintiff for allegedly criticizing a cultural survey. As noted above, the comparison presents a factual dispute. *Bledsoe*, 42 F.4th at 586.

The same evidence of Defendants' failure to investigate and discipline Mr. Paris for his discriminatory comment also raises factual questions regarding Defendants' motivation. This evidence demonstrates that Defendants selectively enforced their Non-Discrimination Policy. As one District Court noted, "Businesses need to consistently enforce disciplinary policies because selective enforcement would open the door to discrimination allegations." *Austin v. Fuel Systems, LLC*, 379 F. Supp. 2d 884, 904 (W.D. Mich. 2004). Selective enforcement of policies raises a question regarding whether the stated business reason was a pretext for discrimination. *See Hollins v. Atlantic Co., Inc.*, 188 F.3d 652 (6th Cir. 1999); *Alexander v. Local 496*, 177 F.3d 394 (6th Cir. 1999).

A factual question about Defendants' motivation was further raised by the evidence of a discriminatory atmosphere amongst the upper echelon of the Coulter Administration, in particular, the numerous discriminatory comments made by Ms. Lynch, the individual who oversaw Oakland County's Human Resources functions

and who had involvement in Plaintiff's dismissal.  This Court has explained:

> Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff.  "While evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff."

> Discriminatory statements may reflect a cumulative managerial attitude among the defendant-employer's managers that has influenced the decisionmaking process for a considerable time.  Thus, management's consideration of an impermissible factor in one context may support the inference that the impermissible factor entered into the deicsionmaking process in another context. . . . This is especially true when the discriminatory statement is "not an off-hand comment by a low-level supervisor" but a remark by a senior official evidencing managerial policy.

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998)(citations omitted).   In this case, Ms. Lynch made numerous age-related comments demonstrating the discriminatory atmosphere, including, but not limited to, referring to two older, female employees as "grandmas," referring to older, long-term employees as "dead wood," referring to older employees as "old timers," commenting on how there were a lot of employees that had been there "a long time and it's way too long," and indicating she would get rid of the "dead wood" "one way or another."  (**ECF No. 63-11, PageID.1032-1033, 1037-1038**); (**ECF No. 72-9, PageID.2539**).   Such statements evidence the existence of a discriminatory atmosphere, constituting additional evidence of discrimination and pretext.

Defendants also failed to comply with various policies.  Defendants failed to provide Plaintiff with an opportunity to respond to the charges against him at the *Loudermill* hearing in violation of Defendants' policies.  *See* (**ECF NO. 64-15, PageID.1354-1356**).  Both prior to and at the pre-termination hearing, Plaintiff was instructed that the hearing was only to provide notice and it was not his opportunity to plead his case.  When Plaintiff's attorney sought clarification, Ms. Fisher specifically said that the hearing was not the place for Plaintiff to state whether he agreed or disagreed with the discipline, but only to make sure he understood the charges.  Defendants' actions violated its Pre-Termination Hearings policy.  *See* (**ECF No. 64-15, PageID.1354-1356**).  Defendants also violated the Personnel Appeal Board rules and regulations by failing to permit Plaintiff to present affidavits, when allowed under the rules, failing to subpoena witnesses as authorized in the rules, and failing to provide Plaintiff with the requested evidence.  An employer's failure to follow its policies, especially related to discharge, is evidence of pretext. *DeBoer v. Musashi Auto Parts, Inc.*, 124 F App'x 387, 394 (6th Cir. 2005); *Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 126 (6th Cir. 2007).

Considering Defendants' disparate treatment of Plaintiff compared to Mr. Paris, Defendants' use of unsubstantiated claims from the 2020 investigation, Defendants' failure to provide Plaintiff with the evidence against him and an opportunity to respond, Defendants' failures to comply with its policies, the

discriminatory atmosphere created by the repeated age-biased statements from the official who oversaw the Human Resources Department, and the other evidence in the record, the District Court erred in failing to find a genuine issue of material fact existed whether Defendants discriminated against Plaintiff because of his age.

## III.   THAT THE DISTRICT COURT ERRED IN FAILING TO FIND A FACTUAL DISPUTE REGARDING PLAINTIFF'S POLITICAL AFFILIATION RETALIATION CLAIM

The First Amendment guards against retaliation based on political affiliation. *Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021). To establish a claim of political affiliation retaliation, a plaintiff must show that: (1) he engaged in constitutionally protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in party by his protected conduct. *Id*. If the plaintiff satisfies this burden, the employer must show that the same action would have been taken in the absence of the plaintiff's protected activity. *Holsapple v. Cunningham*, 817 F. App'x 95, 102 (6th Cir. 2020). The District Court concluded that there was insufficient evidence that Plaintiff engaged in constitutionally protected conduct. However, a close examination of the District Court's reasoning shows that Plaintiff did in fact reference evidence that the District Court indicated would have been sufficient based on prior case law.

The Sixth Circuit has explained that "[i]n the political discharge context, protected activity most commonly includes adopting certain political beliefs, supporting a particular political candidate, or affiliating with a political party or group." *Garvey v. Montgomery*, 128 F. App'x 453, 458 (6th Cir. 2005).  These protections "apply to political differences of any kind, not merely differences in party membership." *McCloud v. Testa*, 97 F.3d 1536, 1548 (6th Cir. 1996).  This includes "non-ideological political factions of the same party." *Id*. at 1150.  The Sixth Circuit has further recognized that actual affiliation is not necessary, and that retaliation based on a perceived political affiliation is actionable. *Dye v. Office of the Racing Com'n*, 702 F.3d 286, 300 (6th Cir. 2012).

That Defendants perceived Plaintiff to be politically affiliated with the Patterson administration is directly evidenced by Ms. Wood's testimony.  Ms. Wood admitted that Plaintiff was viewed as part of the Patterson administration.  (**ECF No. 63-7, PageID.966**).  There is also significant circumstantial evidence that Plaintiff was perceived as loyal to or part of the Patterson administration, which was noted but overlooked by the District Court.  Ms. Wood's admission was further confirmed by Mr. Paris' statements.  In his October 7, 2020, complaint, Mr. Paris accused Plaintiff of being protected by the "remnants" of the "former administration" and specifically referenced the fact that he made the complaint within days of an election in which the County could "once again" be under leadership that did not believe in

a diverse and inclusive environment.  (**ECF No. 72-3, PageID.2452**).  In his October 18, 2021, complaint, Mr. Paris repeated those statements.  (**ECF No. 72-13, PageID.2633-2634**).  In his October 26, 2021, email to Mr. Coulter, Mr. Paris accused Plaintiff of having a political "agenda" against Diversity, Equity, and Inclusion efforts and perceived Plaintiff as sharing that view with the prior Republican administration and Mr. Coulter's political opponents.  (**ECF No. 72-18, PageID.2714**).  Oakland County leadership also viewed the older, long-term employees as part of the Patterson administration as evidenced by Ms. Lynch's statements, referring to such individuals as "dead wood" and indicating a desire to get rid of such employees "one way or another," including through the VESIP program.  (**ECF No. 63-11, PageID.1032-1033, 1037-1038**).

In deviation from the appropriate standard of review, the District Court did not address said evidence.  Instead, in conclusory fashion, the District Court stated that Plaintiff had not pointed to any evidence that Plaintiff was perceived to be loyal to Patterson or affiliated with the Republican party.  (**ECF No. 78, PageID.3153**).  The District Court then relies upon *Dye*, 702 F.3d 286, pointing to two facts: (1) evidence of employees supporting a Republican candidate for governor, and (2) evidence that Democratically affiliated employees were treated more favorably than those perceived to be affiliated with the Republican party.  (**ECF No. 78, PageID.3153-3154**).  Both of those facts are present in the instant case.  As noted

above, Ms. Wood's testimony admits that Plaintiff was perceived as being not only affiliated with but part of the Patterson administration. Moreover, Mr. Paris, who clearly identifies Plaintiff as supporting Patterson, whereas Mr. Paris did not, was treated more favorably in that a complaint that he violated the Non-Discrimination Policy was not investigated and he did not receive discipline. This demonstrates that a Coulter supporter, Mr. Paris, was treated more favorably than Plaintiff, who was perceived to be affiliated with Patterson. This is precisely the evidence the District Court pointed to, to establish what would be sufficient to show a factual dispute regarding Plaintiff's political affiliation. Because the record contains such evidence, the District Court's conclusion is in error and requires reversal.

## IV. THAT THE DISTRICT COURT ERRED IN FAILING TO FIND A FACTUAL DISPUTE REGARDING PLAINTIFF'S PRE-DEPRIVATION DUE PROCESS CLAIM

In procedural due process claims, the Sixth Circuit applies the following test:

[A] procedural due process analysis asks two questions. "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon the deprivation were constitutionally sufficient."

*Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005) (citations omitted). It is undisputed that Plaintiff as a merit system employee had a property interest in his continued employment. As such, the sole question for the District Court was whether Defendants complied with the minimum pre-deprivation due process

requirements.  The District Court concluded that Defendants complied with the due

process requirements despite the fact that Oakland County's Human Resources

Department told Plaintiff that the pretermination hearing was "not the time" Plaintiff

"would plead his case."  In reaching said conclusion, the District Court erred and

ignored the minimum due process requirement that Plaintiff be given an opportunity

to be heard at a "meaningful time."

In *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 261; 105 S. Ct. 1487

(1985), the Supreme Court instructed that an "essential principle of due process"

was that the deprivation of the property interest "be preceded by notice and

opportunity for hearing appropriate to the nature of the case."  *Id*. at 542.  While,

except in rare instances, a pre-termination hearing is necessary, the hearing "need

not be elaborate."  *Loudermill*, 470 U.S. at 545; 105 S. Ct. 1487.  Setting forth the

minimum requirements of procedural due process when discharging a just-cause

employee, the Supreme Court held:

> The essential requirements of due process . . . are notice and an
> opportunity to respond.  The opportunity to present reasons, either in
> person or in writing, why proposed action should not be taken is a
> fundamental due process requirement.  The tenured public employee is
> entitled to oral or written notice of the charges against him, an
> explanation of the employer's evidence, and an opportunity to present
> his side of the story.

*Id*. at 546 (citations omitted).  The Sixth Circuit has further explained that the

fundamental requirement of the opportunity to be heard must occur "at a meaningful

time and in a meaningful manner." *Johnson v. Morales*, 946 F.3d 911, 927 (6th Cir. 2020).

Defendants did not give Plaintiff a meaningful opportunity to respond to the allegations against him, because although he was scheduled to have a pre-termination hearing, Oakland County's Human Resources Department misrepresented the purpose of the pre-termination hearing and what is supposed to happen at such hearings. On November 22, 2021, Wood wrote Plaintiff's attorney the following:

> The hearing that is taking place is brief, to inform Mr. Hieber of the notice of being terminated and to provide the departments cause.
>
> Also, this is not the time that Mr. Hieber would plead his case, that would be done afterward through the Personnel Appeal Board process.

(**ECF No. 72-20, PageID.2723**). The key component of the pre-termination hearing is precisely to have the employee plead his case and present reasons why the proposed discharge should not occur. *Loudermill*, 470 U.S. at 546; 105 S. Ct. 1487. Additionally, at the *Loudermill* hearing, Plaintiff reported that the termination was a pre-determined outcome of the hearing, corroborated by Ms. Wood's email from the day before, and noted that he was informed the hearing was not his opportunity to respond to the allegations. This was confirmed by Ms. Fisher, the hearing officer. By frustrating Plaintiff's opportunity to respond, Defendants violated Plaintiff's procedural due process rights as a matter of law.

In response to this argument, it appears that the District Court developed an argument for Defendants, looked for case law to support it, and rejected Plaintiff's evidence, all of which violated the standard of review.  The District Court relied upon the fact that Plaintiff was interviewed by corporation counsel on November 12, 2021, to determine that Plaintiff "was given an extensive opportunity to present his side of the story and respond to the allegations."  (**ECF No. 78, PageID.3158**). Plaintiff was not given an opportunity to respond, because Plaintiff had not been advised of the charges against him and the evidence the County had against him or a summary of the evidence against him.[5]  Plaintiff did not receive that notice until November 22, 2021.  *See* (**ECF No. 64-15, PageID.1352-1353**).  Without knowing what the allegations against him were, Plaintiff could not have had a "meaningful" opportunity to respond, because he would have not known what he needs to respond to.

Moreover, the District Court's opinion reads *Buckner v. City of Highland Park*, 901 F.2d 491 (6th Cir. 1990), in far too broad a fashion, such that the District Court appears to excuse any failure to provide a pre-termination hearing so long as the public employer asks an accused individual some questions about the underlying allegations, regardless of whether the employee knows what the allegations against

---

[5] When Defendants placed Plaintiff on administrative leave, Plaintiff did not receive any notice of the allegations.  See (**ECF No. 72-16, PageID.2711**).

him are.  *Buckner* was based upon very unique facts.  In *Buckner*, the plaintiff was a detective employed by a municipality.  *Id*. at 492.  On one evening, the plaintiff sexually assaulted a complaining witness.  *Id*.  The matter was reported to the chief of police and the plaintiff's supervisor.  *Id*.  The following day, another officer contacted the plaintiff and informed him of said witness's complaint.  *Id*.  Upon returning to work, the plaintiff questioned the chief union steward about the complaint.  *Id*.  When the plaintiff learned the chief of police wanted to discuss the complaint with him, the plaintiff fled to the hospital, claiming he was in need of treatment for alcohol abuse; however, his records show that he had never been diagnosed as an alcoholic.  *Id*.  A lieutenant and a union steward visited the plaintiff in the hospital; after the plaintiff met with his steward alone, the lieutenant showed the plaintiff the written complaint and questioned him about the contents.  *Id*. The plaintiff refused to comment on the allegations and, as such, he was suspended with pay pending further investigation.  *Id*.  The chief subsequently sent the chief union steward to advise the plaintiff of the charges against him and obtain his account of the incident; once again, the plaintiff refused to make a statement.  *Id*.  The chief of police later made a preliminary determination and recommendation to discharge the plaintiff.  *Buckner*, 901 F.2d at 493.  The plaintiff grieved his termination and claimed he was deprived of procedural due process.  *Id*.

The Sixth Circuit analyzed whether the minimum due process requirements

were met. In doing so, the Court first noted that the plaintiff had been confronted with the charges against him by both his union representative and a lieutenant. *Buckner*, 901 F.2d at 495. The Court further noted that his union representative presented him with the complainant's written complaint. *Id*. As such, the Court determined that the first two elements, notice and summary of the evidence, were met. *Id*. With notice of the allegations against him, the interrogation by the lieutenant in the presence of union representatives about the allegations and request for his side of the story satisfied the opportunity to respond requirement. *Id*. at 495-496. Importantly, the Court noted that "an interrogation does not, as a matter of law, equal a full and fair opportunity to respond to charges which jeopardize one's employment." *Id*. at 496. Under these unique facts, the pre-deprivation due process requirements were met. *Id*.

Unlike *Buckner*, in the instant case, Plaintiff did not receive notice and a summary of the evidence against him until November 22, 2021, ten (10) days after Plaintiff was interviewed by corporation counsel. This fact clearly distinguishes the instant case from the facts of *Buckner*. The facts of this are more analogous to those present in *McDaniel v. Princeton City School Dist. Bd. of Educ.*, 45 F. App'x 354 (6th Cir. 2002). In *McDaniel*, the plaintiff was a special education teacher with just cause employment. *Id*. at 355. The School Board provided the plaintiff with a notice of a pre-disciplinary hearing, identifying the allegations of attendance pattern,

failure to remain in classroom, excessive personal calls on work time, and neglect of duty. *Id*. After the hearing, the assistant superintendent advised the plaintiff that as a result of the pre-disciplinary hearing, the district concluded that she had a pattern of being out of her assigned area going back several years and mentioned specific issues with lack of lesson plans, lack of student behavior plans, inappropriate discipline of students, and failure to remain in her classroom. *Id*. at 355-356. Ultimately, the assistant superintendent notified the plaintiff that he was recommending her termination for a "pattern of neglect of duty." *Id*. at 356. The Sixth Circuit concluded that because the list of charges, lacking student plans and inappropriate discipline, were not "mentioned in the Notice sent to Plaintiff, Plaintiff had no opportunity to respond to those charges prior to her termination." *Id*. Because the plaintiff did not have an opportunity to respond to those charges, the District Court properly determined that the school board had violated the plaintiff's constitutional rights by terminating her "without first providing her with proper pretermination notice and an opportunity to be heard on the charges against her." *Id*. at 358-359.

In the case *sub judice*, Oakland County corporation counsel interviewed Plaintiff on November 12, 2021. Plaintiff did not receive notice of the allegations

against him and a summary of the evidence supporting those allegations[6] until November 22, 2021.  While Plaintiff was scheduled for a pre-termination hearing for November 23, 2021, the day before, November 22, 2021, the Human Resources Department informed Plaintiff's attorney, referencing the upcoming hearing, "this is not the time that Mr. Hieber would plead his case, that would be done afterward through the Personnel Appeal Board process."  This instruction was repeated by Ms. Fisher during the actual *Loudermill* pre-termination hearing.  Defendants thwarted any opportunity Plaintiff had to respond to the allegations after Plaintiff received notice of those allegations.  Because of Defendants' actions, Defendants failed to provide Plaintiff with the minimum requirements of pre-deprivation due process as a matter of law.  Because Defendants failed to provide the minimum due process prior to discharging Plaintiff from his employment, Defendants violated his due process rights and this Court should reverse the District Court on this issue.

## V.    THAT THE DISTRICT COURT ERRED IN FAILING TO FIND A FACTUAL DISPUTE REGARDING PLAINTIFF'S POST-DEPRIVATION DUE PROCESS CLAIM

Where, as in the instant case, employers use "an abbreviated pre-termination hearing, due process requires that a discharged employee's post-termination hearing

---

[6] There are also issues with the adequacy of the summary of the evidence.  For instance, the notice relates several comments "employees" described, but do not identify the employees who reported those comments.  This is important, because knowing the identity of the accuser matters tremendously in responding to an allegation.  For instance, one might respond to such an allegation by identifying reasons why the employee might make a false complaint, such as recent discipline, disagreements in the past, or close association or friendship with another employee making a false complaint.

be substantially more 'meaningful.'" *Carter v. Western Reserve Psych. Habilitation Ctr.*, 767 F.2d 270, 273 (6th Cir. 1985). The Sixth Circuit has explained:

> At a minimum this requires that the discharged employee be permitted to attend the hearing, to have the assistance of counsel, to call witnesses and produce evidence on his own behalf, and to know and have an opportunity to challenge the evidence against him. The severity of depriving a person of the means of livelihood requires that such persons have at least one opportunity for such a full hearing, so that he may challenge the factual basis for the state's action and may provide reasons why that action should not be taken.

*Id*. It is well-established that due process requires the opportunity for a post-deprivation hearing be before a neutral decisionmaker. *Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004). The Supreme Court has explained that "[n]ot only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'" *Withrow v. Larkin*, 421 U.S. 35, 47; 95 S. Ct. 712 (1975). Case law also shows that due process requires disclosure of the evidence against the employee. *See Morrissey v. Brewer*, 408 U.S. 471, 488-489; 92 S. Ct. 2593 (1972).

In rejecting Plaintiff's arguments that Defendants violated Plaintiff's post-deprivation procedural due process rights, the District Court made inappropriate findings of fact and failed to view the evidence in a light most favorable to Plaintiff. As noted above, the ability to present evidence and witnesses is a fundamental aspect of due process. The PAB refused to issue subpoenas or otherwise order employees to participate in the hearing. The County's attorney also misrepresented whether the

PAB had authority to subpoena witnesses. The rules specifically permit subpoenas and provides, "The Board may subpoena witnesses and records as it finds necessary." (**ECF No. 72-2, PageID.2395**). While the subpoena may not be a court issued order, a public employer can certainly instruct an employee to participate in a hearing as it controls the employee's terms and conditions of employment; it would be insubordination to disobey such a command. The refusal to subpoena employee-witnesses is even more important, because of the concerns expressed about the inability to secure cooperation or even speak with employees. Defendant Jen's emails made it clear to employees that they should not be speaking with Plaintiff and were instructed to report every conversation with Plaintiff to Human Resources. The County's agreements with retired employees also prohibited those employees from disparaging or criticizing the County and its administration. The refusal to issue subpoenas considering the chilling effect Jen's emails and the County's retirement agreements deprived Plaintiff of his due process rights to call witnesses and present evidence. The District Court erred by ignoring said evidence, specifically the Merit System Rule providing for subpoenas, and concluded the "PAB had no subpoena powers," a factual determination that was clearly disputed. (**ECF No. 78, PageID.3164**). Essentially, the District Court concluded that there was no interference with Plaintiff's ability to call witnesses, because Oakland County promised it would not further interfere with Plaintiff's ability to secure witness

cooperation after the PAB hearing had already begun. The PAB had the ability to subpoena witnesses as set forth in the Merit System Rules and refused to do so, preventing Plaintiff from obtaining compelled testimony and assuring cooperation from witnesses. This denied Plaintiff the right to call witnesses and present his evidence.

The District Court also decided a factual issue as to whether affidavits were permitted at the PAB hearing. The District Court overlooked testimony from Ms. Fisher indicating that affidavits were permissible and allowable at a PAB hearing. *See* (**ECF No. 63-6, PageID.950**). Ignoring that evidence, the District Court concluded that affidavits on substantive issues were not permitted. (**ECF No. 78, PageID.3164**). The District Court also sought to excuse the refusal to consider affidavits, claiming there is a "fundamental unfairness" in permitting one side to submit affidavits, because of a lack of an opportunity for cross-examination. (**ECF No. 78, PageID.3165**). The District Court assumes, without argument or basis, that presenting affidavits or declarations is fundamentally unfair. This is a strange notion as courts across the country routinely consider affidavits and declarations. There is no unfairness, because if Defendants wanted to counter that affidavit-based testimony, Defendants could have called those individuals as live witnesses and cross-examined them. Instead of requiring Defendants to prove their case, the PAB and the District Court limited Plaintiff's ability to present his evidence and witnesses

in the manner he chose, interfering with Plaintiff's due process rights.

Importantly, Defendants also refused to disclose their evidence against Plaintiff prior to his termination and prior to the initiation of the PAB hearing and also refused to provide the documents requested by Plaintiff. While Defendants provided Plaintiff with the Notice of Intent to Dismiss, which identifies several statements employees alleged Plaintiff made, the notice does not provide who claimed Plaintiff made those statements nor any information as to when and in what context those statements were made. Despite recording the interviews of nine witnesses, Defendants did not provide either the recordings or the transcriptions of those recordings prior to the PAB hearing. As noted above, an employee has the due process right to know and challenge the evidence the employer has against him. Without identifying who attributed those statements to Plaintiff and in what context those statements occurred, Defendants did not give Plaintiff notice of the allegations against him. It prevented Plaintiff from being able to rebut the charges or present evidence as what might motivate the employees to make false accusations. Plaintiff's attorney specifically complained at the PAB hearing that Defendants had not provided any witness statements. (**ECF No. 64-25, PageID.1339-1440**). Plaintiff's counsel also complained that the documents requested by Plaintiff had not been produced. (**ECF No. 64-25, PageID.1339-1440**). On January 12, 2022, Plaintiff's counsel made a specific request for documents to Mr. Klemptner. (**ECF**

**No. 72-27, PageID.2913-2914**).  Defendants' refusals to provide such documents prior to the start of the PAB hearing denied Plaintiff his due process rights to know and have an opportunity to challenge the evidence against him.  *See Carter*, 767 F.2d at 273.

Lastly, the District Court ignored evidence that demonstrated a conflict of interest for Board Member Lepler and the Coulter Administration's ability to control the outcome of the PAB hearing.  On January 20, 2022, after learning that one of the PAB members was Barry Lepler, Ms. Chambers, the highest-ranking Oakland County executive official under Mr. Coulter, exclaimed excitement at the fact that Mr. Lepler was on the board, stating, "Barry Lepler!  He is one of my besties!!" (**ECF No. 72-24, PageID.2799**).  The District Court did not see any issue with a conflict of interest from a Deputy County Executive having a friendship with a PAB member.  (**ECF No. 78, PageID.3163**).  But that is an oversimplification of the issue. The question is not simply whether having a friendship with someone on the Board would cause a conflict; clearly employees of local governmental units might be friends with other individuals volunteering for public service.  The question is why Ms. Chambers would express such a degree of excitement about the fact that one of her "besties" was on the board.  While her excitement may be benign and a reasonable juror could draw that inference, on a motion for summary judgment, the District Court was required to draw all inferences in Plaintiff's favor.  The fact that

Ms. Chambers would express such excitement also permits more nefarious inferences, such as, she expressed excitement, because she could use her friendship to secure Mr. Lepler's vote in favor of dismissal. It is the province of the jury to determine which inferences are true. Moreover, the fact that Ms. Chambers expressed that excitement and wished to control the outcome of the appeal is consistent with the remainder of Plaintiff's allegations that Defendants sought to eliminate Plaintiff, the older, long-term employee viewed as part of the Patteson administration. The question of the impartiality of the PAB members is further supported by other acts of Defendants, such as failing to provide a meaningful opportunity to respond pre-deprivation, refusing to subpoena witnesses, denying the use of affidavits, and refusing to provide requested documentation. When considering this fact in light of the other failures of Defendants to provide due process, a genuine factual dispute exists whether Defendants provided Plaintiff with constitutionally adequate post-deprivation process.

## VI. THAT THE DISTRICT COURT ERRED IN FAILING TO FIND A FACTUAL DISPUTE REGARDING WHETHER DEFENDANT JEN WAS ENTITLED TO QUALIFIED IMMUNITY

The determination of whether an official is entitled to qualified immunity involves two questions: (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether the right was clearly established. *Estate of Carter v. City of Detroit*, 408

F.3d 305, 310 (6th Cir. 2005). The District Court found that Defendant Jen was entitled to qualified immunity solely based on its determination that Plaintiff had not established a factual dispute regarding his constitutional claims. (**ECF No. 78, PageID.3166**). Because the District Court's failure to find a factual dispute regarding Plaintiff's constitutional claims was in error, as argued above, the District Court's conclusion that Defendant Jen was entitled to qualified immunity was also error. As such, this Honorable Court should reverse the District Court's determination that Defendant Jen was entitled to qualified immunity.

## VII.   THAT THE DISTRICT COURT ERRED IN FAILING TO FIND A FACTUAL DISPUTE REGARDING PLAINTIFF'S DEFAMATION CLAIM

To establish a claim of defamation, a plaintiff must show:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication.

*Smith v. Anonymous Joint Enterprise*, 487 Mich. 102, 113; 793 N.W.2d 533 (2010). In evaluating Plaintiff's defamation claim, the District Court combined its discussion of defamation by implication and the actionability of statements of opinion. Because of that combination, the District Court's analysis is confused and does not adequately address what Plaintiff is actually claiming in this matter.

First, this Court should note that Michigan, like many jurisdictions,

distinguishes between pure statements of opinion, which are protected by the First Amendment, and mixed statements of opinion and fact, which do not receive such protection. By not recognizing this distinction, the District Court failed to appreciate that Defendant Jen's statement was based upon undisclosed defamatory facts and the implications taken therefrom, which serve as a basis for his liability. A "court may determine, as a matter of law, whether the words in question, alleged by the plaintiff to be defamatory, are capable of defamatory meaning." *Sawabini v. Desenberg*, 143 Mich. App. 373, 379; 372 N.W.2d 559 (1985). In *Ireland v. Edwards*, 230 Mich. App. 607; 584 N.W.2d 632 (1998), the Michigan Court of Appeals recognized that the U.S. "Supreme Court has rejected the idea that all statements of 'opinion' are protected." *Id*. at 616 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17-20; 110 S. Ct. 2695 (1990)). In *Milkovich*, the Supreme Court noted that the First Amendment protection for statements of opinion first arose from dicta in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323; 94 S. Ct. 2997 (1974), which provided:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Gertz*, 418 U.S. at 339-340; 94 S. Ct. 2997. The *Milkovich* Court, however, clarified that some statements of opinion remain actionable and rejected "a wholesale

defamation exemption for anything that might be labeled 'opinion.'"  497 U.S. at 18; 110 S. Ct. 2695.  The *Milkovich* Court continued to explain:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to a conclusion that Jones told an untruth.  Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.  Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."  Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] by simply using, explicitly or implicitly, the words 'I think.'"

*Milkovich*, 497 U.S. at 18-19; 110 S. Ct. 2695.

In *Ireland*, the Michigan Court of Appeals discussed *Milkovich* at length and attempted to demonstrate the difference between actionable and non-actionable statements of opinion:

> One of the difficulties in addressing defamation issues lies in determining whether specific statements are actionable.  The United States Supreme Court has rejected the idea that all statements of "opinion" are protected.  Instead, the Court has directed that a statement must be "provable as false" to be actionable.  By way of example, the Court suggested that the statement "In my opinion Mayor Jones is a liar" would be potentially actionable, while the statement "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin" would not be actionable.  The Court apparently intended these examples to illustrate the difference between an objectively verifiable event, such as lying, and a subjective assessment like "shows his abysmal ignorance. . . ."

*Ireland*, 230 Mich. at 616; 584 N.W.2d 632 (citations omitted).   Following

*Milkovich*, courts have made a distinction between statements of opinion that are provable as false, which are known as "mixed opinions," and statements of opinion which are not provable as false, which are known as "pure opinions." This Court has provided a good explanation using similar examples as the *Milkovich* Court:

> The Supreme Court has held that "expressions of 'opinion' may often imply an assertion of objective fact." For example, "[i]f a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth." We have characterized such statements as "mixed" expressions of opinion, "which may . . . be the basis for an action for defamation, since it implies the allegation of undisclosed defamatory facts as the basis for the opinion."

*Harris v. Bornhorst*, 513 F.3d 503, 522 (6th Cir. 2008). Michigan courts have likewise maintained the distinction, albeit without much explication:

> A libel may consist of a statement of fact or a statement in the form of opinion, but a statement of opinion is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

*Fisher v. Detroit Free Press, Inc.*, 158 Mich. App. 409, 413; 404 N.W.2d 765 (1987). The recognition of mixed statements of opinion, which implies the existence of undisclosed defamatory facts goes to the heart of Plaintiff's claim, because Plaintiff has brought forward a claim of defamation by implication.

Michigan law recognizes defamation by implication. *See Reighard v. ESPN, Inc.*, 341 Mich. App. 526, 540; 991 N.W.2d 803 (2022). In *Reighard*, the Michigan Court of Appeals explained:

> A subset of the tort of defamation is known as "defamation by

implication." "[A] cause of action for defamation by implication exists in Michigan, but only if the plaintiff proves that the defamatory *implications* are materially false[.]" "[S]uch a cause of action might succeed even without a direct showing of any actual literally false *statements*." Liability for defamation by implication may be imposed based not on what is affirmatively stated, but on what is implied when a defendant "juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts [such that] he may be held responsible for the defamatory implication[.]" "A defamation by implication stems not from what is literally stated, but from what is implied."

*Reighard*, 341 Mich. App. at 540-541; 991 N.W.2d 803.

The District Court erred by failing to evaluate the implications that arise from Defendant Jen's statements. In his October 22, 2021 email, Defendant Jen wrote to the entire "Equalization Team," indicating he "wanted to provide an update in writing to the full team so everyone has clarity on a few key things while Dave Hieber is on leave." (**ECF No. 64-17, PageID.1360**). Defendant Jen then advised "all employees" that they need to work from home that day and the following Monday. (**ECF No. 64-17, PageID.1360**). He further advised staff, as they returned to the office, to park in a certain public parking lot and only enter/exit through the main entrance until further notice. (**ECF No. 64-17, PageID.1360**). Juxtaposing these statements with Defendant Jen's further statement that "It is my goal to ensure that employees work in a safe environment free of intimidation, coercion, harassment, retaliation, or discrimination. . . ." implies the existence of undisclosed facts that Plaintiff presented a danger to the work environment and employees'

safety.  By giving an update while Plaintiff is "on leave," implies that these changes were as a result of undisclosed behavior Plaintiff engaged in that caused a need to change how and where employees report to work.

Similarly, in Defendant Jen's November 24, 2021, email, he advised the Equalization Department that Plaintiff had been "separated."  (**ECF No. 64-23, PageID.1421**).  Defendant Jen then informed staff that Plaintiff had been advised to refrain from contacting any staff "as there is no business reason to do so," and then continued to note that Plaintiff had been banned from coming onsite.  (**ECF No. 64-23, PageID.1421**).  Next, Defendant Jen instructs staff to call 9-1-1 and alert the sheriff's deputies onsite if Plaintiff appeared at the worksite and further instructs staff to call 9-1-1 if Plaintiff appeared at their home, implying that the threat posed by Plaintiff extended to employees' homes.  (**ECF No. 64-23, PageID.1421-1422**).  Finally, Defendant Jen reiterates that staff should park in a particular lot and use a particular entrance, reaffirming the prior implication that the directives to work from home, park in a particular location, and use the main entrance was related to Plaintiff being dangerous.  (**ECF No. 64-23, PageID.1422**).  Once again, these statements imply the knowledge of undisclosed facts indicating that Plaintiff presented a danger and safety risk to other employees.  Defendant Jen implies knowledge of facts indicating that Plaintiff may appear at employees' homes or at work in contradiction to the orders given to him.

These implications are not based on speculation, but the factual implications that directly arise from the content of Defendant Jen's email. The District Court overlooked the fact that employees did in fact view Defendant Jen's emails in this way. It is worth recalling Ms. Kurmas' January 26, 2022 complaint in which she expressed how fearful the defamatory implications of Defendant Jen's emails made her:

> The emails I received from both Amanda and Kyle about the situation made it feel as if there was a threat immediately at hand. We were not to go into the office and when we eventually did resume, entering and exiting was to be exclusively through the Sheriff patrolled security entrance and we were to call 9-1-1 if Dave was seen. Obviously, this directive gave the illusion of an immediate and direct threat and gave anxiety to all involved. There was no communication to say otherwise and until the Zoom call hosted by Kyle, it was not addressed further. . . . It was only then, two months after, did we learn there was no threat made and it was only precautionary. I do not understand why the county would willingly allow us to be fearful for our safety and not let us know that in reality, it was only a precaution. . . . The whole situation was handled in poor taste and considering my son being present for the recent Oxford tragedy, it is shameful the county would fear monger their employees rather than doing what they could to dispel any feelings of insecurity and doubt.

(**ECF No. 72-33, PageID.3082**). Mr. Paris also read Defendant Jen's emails in a similar manner. When Mr. Paris wrote Mr. Coulter on October 26, 2021, he specifically noted how the "security protocols" lead him to believe the Oakland County administration believed he was a danger:

> I have never discussed my fear of Dave's physical retaliation towards me; however, I cannot help but believe that the administration has these concerns given the necessary security protocols I must follow when I

return to the campus today.

(**ECF No. 72-18, PageID.2714**).

The District Court did not take into consideration how a reasonable person would read Defendant Jen's emails and the implications that arise therefrom; nor did it consider the way actual employees read the emails, like Ms. Kurmas and Mr. Paris. Instead, the District Court, again, flipped the standard of review on its head, deciding issues of fact and drawing inferences in Defendants' favor. Common sense instructs that a government does advise employees to work from home, park in a public parking lot, and only use an entrance patrolled by deputies, unless there was some reason to do so. By tying those security actions to the placement of Plaintiff on a leave of absence and his termination, Defendants implied that Plaintiff had engaged in some undisclosed action, such that he made some threat or attacked someone or had the capacity and willingness to do so. The District Court attempted to evade that obvious conclusion by suggesting that what Defendant Jen said was true, which is a question of fact for the jury, and framing the issue as Defendant expressing an opinion about potential future conduct. The District Court's reasoning on this point, however, just pushes the can down the road. To imply that there is a concern or should be a concern about Plaintiff potentially engaging in some criminal or otherwise inappropriate act in the future would likewise be based on undisclosed facts suggesting Plaintiff is a danger or threat. In other words, for there to be a

concern, whether immediate or based in the future, there must have been something that caused that concern. The implication may be worse than a direct accusation, because it permits the readers of the email to speculate and wonder what Plaintiff did or said to justify Defendants' taking such actions. Those undisclosed facts, which do not exist, are inherently false as no one has taken the position that Plaintiff actually posed a security threat to Oakland County or its employees. To borrow language from *Milkovich*, Defendant Jen's statement "implies a knowledge of facts which lead to a conclusion that" Plaintiff was a danger or threat and, even if Defendant Jen specified the reasons why he sent the emails, which he did not, his statements imply the existence of false statements of fact and, therefore, are actionable.

The District Court also found that Defendant Jen was protected by a qualified privilege. A necessary element for a qualified privilege to apply is that the statement be made in "good faith." *Prysak v. RL Polk Co.*, 193 Mich. App. 1, 15; 483 N.W.2d 629 (1992). Even if a statement is made in good faith, a plaintiff may overcome the qualified privilege by showing that the communication was made with "actual malice." *Id*. Actual malice "exists when the defendant knowingly makes a false statement or makes a false statement in reckless disregard for the truth." *Anonymous Joint Enterprise*, 487 Mich. at 114; 793 N.W.2d 533. Actual malice may be evidenced by a fabrication of the defamatory statements or implications. *See*

*Hildebrant v. Meredith Corp.*, 63 F. Supp. 3d 732, 746 (E.D. Mich. 2014); *Armstrong v. Shirvell*, 596 F. App'x 433, 447 (6th Cir. 2015). The jury may find the existence of actual malice from the language of the communication itself as well as from extrinsic evidence. *Bacon v. Michigan Cent. R. Co.*, 66 Mich. 166, 172-173; 33 N.W. 181 (1887).

The District Court's evaluation of this issue was prejudiced by its prior determination that Defendant Jen's emails and the implications arising therefrom were true. When viewing the evidence in a light most favorable to the Plaintiff, as required by the standard of review, the defamatory implications arising from Defendant Jens' emails made Plaintiff falsely appear as security threat. Defendant Jen did not inform the Equalization Department that the change in security measures was "precautionary" and did nothing to alleviate the obvious concerns that would arise from employees receiving those emails. If a reasonable juror could agree with Plaintiff that Defendant Jen defamed Plaintiff by implication and Plaintiff did not actually pose a threat to security, then a reasonable juror could likewise conclude that Defendant Jen intentionally created those false implications, knowing that Plaintiff did not pose such a threat. Defendant Jen intentionally created the appearance of danger and implied the existence of a threat, while also encouraging employees to come forward with complaints; from this a juror could conclude that Defendant Jen acted with actual malice. Considering the fabricated implications

based on false undisclosed facts, the content of those implications, the implications suggesting Plaintiff would engage in criminal behavior, and all the other facts surrounding the publication of these statements, a reasonable juror could conclude that Defendant Jen did not act in good faith and/or acted with actual malice, such that the District Court erred by granting Defendants' motion on this ground.

## <u>CONCLUSION & RELIEF REQUESTED</u>

For the reasons set forth above, Plaintiff-Appellant respectfully requests that this Honorable Court reverse the district court's ruling denying Plaintiff's motion to enforce settlement or, in the alternative, to reverse the district court's ruling granting Defendant's motion for summary judgment.

Respectfully submitted,
THE MASTROMARCO FIRM

Dated: <u>October 21, 2024</u>    By:    <u>*/s/ Kevin J. Kelly*</u>
KEVIN J. KELLY (P74546)
Attorneys for Plaintiff-Appellant
1024 N. Michigan Avenue
Saginaw, Michigan 48602
(989) 752-1414
kkelly@mastromarcofirm.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief does not comply with the type-volume limitation pursuant to F<span style="font-variant: small-caps">ED</span>. R. A<span style="font-variant: small-caps">PP</span>. P. 32(a)(7)(B). The relevant sections of the foregoing brief contain 15,383 words of Times New Roman 14-point proportional type. The undersigned has filed a motion for leave to file a brief in excess of the type-volume limitation. The word processing software used to prepare this brief was Microsoft Word.

<div style="margin-left: 40%">

Respectfully submitted,
THE MASTROMARCO FIRM

</div>

Dated: <u>October 21, 2024</u>        By:    */s/ Kevin J. Kelly*
<div style="margin-left: 40%">

KEVIN J. KELLY (P74546)
Attorneys for Plaintiff-Appellant
1024 N. Michigan Avenue
Saginaw, Michigan 48602
(989) 752-1414
kkelly@mastromarcofirm.com

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that Appellant David Hieber's Brief was served by electronic mail using the Sixth Circuit's Electronic Case Filing system on: <u>Christopher M. Trebilcock & Brian D. Shekell</u>.

<div align="right">

Respectfully submitted,
THE MASTROMARCO FIRM
</div>

Dated: <u>October 21, 2024</u>      By:     */s/ Kevin J. Kelly*_____
KEVIN J. KELLY (P74546)
Attorneys for Plaintiff-Appellant
1024 N. Michigan Avenue
Saginaw, Michigan 48602
(989) 752-1414
<u>kkelly@mastromarcofirm.com</u>

**ADDENDUM**
**DESIGNATION OF RECORD**

| Reference No. | Date Entered | PageID Range | Description |
|---|---|---|---|
| R.1 | 06/23/22 | 1-33 | Plaintiff's Complaint |
| R.4 | 06/30/22 | 65-97 | Plaintiff's Amended Complaint |
| R.9 | 09/12/22 | 106-130 | Defendants' Answer to Amended Complaint |
| R.33 | 05/08/23 | 354-374 | Defendants' Response to Motion to Enforce Settlement |
| R.35 | 05/22/23 | 377-380 | Plaintiff's Reply Brief |
| R.63 | 08/24/23 | 652-694 | Defendants' Motion for Summary Judgment |
| R.63-2 | 08/24/23 | 697-841 | Deposition of Hieber |
| R.63-4 | 08/24/23 | 868-907 | Deposition of Bertolini |
| R.63-5 | 08/24/23 | 908-936 | Deposition of Van Pelt |
| R.63-6 | 08/24/23 | 937-957 | Deposition of Fisher |
| R.63-7 | 08/24/23 | 958-977 | Deposition of Wood |
| R.63-9 | 08/24/23 | 989-1004 | Deposition of Lynch |
| R.63-11 | 08/24/23 | 1025-1041 | Deposition of Hain |
| R.63-14 | 08/24/23 | 1058-1064 | Non-Discrimination Policy and Merit System Rules, Article 8 |
| R.64-5 | 08/24/23 | 1136-1139 | 11/12/20 Lynch Memorandum |
| R.64-6 | 08/24/23 | 1140-1142 | 10/18/21 Paris Email |
| R.64-7 | 08/24/23 | 1143-1167 | McLeod Interview Transcript |
| R.64-8 | 08/24/23 | 1168-1200 | Doyle Interview Transcript |
| R.64-9 | 08/24/23 | 1201-1234 | Marshall Interview Transcript |
| R.64-10 | 08/24/23 | 1235-1251 | Glenn Interview Transcript |
| R.64-11 | 08/24/23 | 1252-1279 | Isenberg Interview Transcript |
| R.64-12 | 08/24/23 | 1280-1303 | Walsh Interview Transcript |
| R.64-13 | 08/24/23 | 1304-1317 | Meder Interview Transcript |
| R.64-14 | 08/24/23 | 1318-1349 | Bouchey Interview Transcript |
| R.64-15 | 08/24/23 | 1350-1356 | 11/22/2021 Fisher Letter w/ Attachments |
| R.64-16 | 08/24/23 | 1357-1358 | 10/21/21 Fisher Letter |
| R.64-17 | 08/24/23 | 1359-1361 | 10/22/21 Jen Email |
| R.64-18 | 08/24/23 | 1362-1390 | 11/12/21 Hieber Interview Transcript |
| R.64-20 | 08/24/23 | 1403-1411 | 11/23/21 *Loudermill* Hearing |
| R.64-23 | 08/24/23 | 1420-1422 | 11/24/21 Jen Email |
| R.64-24 | 08/24/23 | 1423-1426 | Hieber Appeals |
| R.64-25 | 08/24/23 | 1427-1498 | 01/28/22 PAB Hearing |

| R.72 | 10/24/23 | 2305-2342 | Plaintiff's Response to Motion for Summary Judgment |
|---|---|---|---|
| R.72-2 | 10/24/23 | 2345-2450 | Merit System Rules |
| R.72-3 | 10/24/23 | 2451-2452 | 10/07/20 Paris Email |
| R.72-4 | 10/24/23 | 2453-2461 | 01/07/21 Wood/Sutherland Memorandum |
| R.72-8 | 10/24/23 | 2529-2530 | Hain Affidavit |
| R.72-9 | 10/24/23 | 2531-2549 | Kramer Deposition |
| R.72-11 | 10/24/23 | 2553 | 10/21/21 Doyle Email |
| R.72-13 | 10/24/23 | 2633-2634 | 10/18/21 Paris Email |
| R.72-15 | 10/24/23 | 2710 | 11/21/21 Jen Text |
| R.72-16 | 10/24/23 | 2711 | 10/21/21 Fisher Letter |
| R.72-17 | 10/24/23 | 2712-2713 | 10/22/21 Jen Email |
| R.72-18 | 10/24/23 | 2714 | 10/26/21 Paris Email |
| R.72-20 | 10/24/23 | 2723 | 11/22/21 Wood Email |
| R.72-24 | 10/24/23 | 2799 | 01/20/22 Chambers Email |
| R.72-27 | 10/24/23 | 2912-2919 | Emails Between Attorneys |
| R.72-31 | 10/24/23 | 3047-3078 | Young Deposition |
| R.72-33 | 10/24/23 | 3080-3083 | Kurmas Complaint |
| R.73 | 11/07/23 | 3084-3092 | Defendant's Reply Brief |
| R.78 | 03/27/24 | 3125-3172 | Opinion & Order Granting Defendants' Motion for Summary Judgment |
| R.79 | 03/27/24 | 3173 | Judgment |
| R.83 | 04/22/24 | 3226-3227 | Notice of Appeal |
| R.88 | 05/31/24 | 3269-3321 | Motion Hearing Transcript |

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414