**Case No. 24-1345**
_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT COURT
_____

**DAVID HIEBER,**

*Plaintiff-Appellant,*

**v.**

**OAKLAND COUNTY and**

**KYLE JEN, in his official and individual capacities,**

*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the
Eastern District of Michigan, Southern District
Honorable F. Kay Behm
Civil Action No. 4:22-cv-11417
_____

**DEFENDANTS-APPELLEES' BRIEF ON APPEAL**

Christopher M. Trebilcock (P62101)
Brian D. Shekell (P75327)
CLARK HILL PLC
500 Woodward Avenue, Suite 3500
Detroit, MI 48226
(313) 965-8300
ctrebilcock@clarkhill.com
bshkekell@clarkhill.com
*Attorneys for Defendants-Appellees*

## DISCLOSURE OF
## <u>CORPORATE AFFILIATIONS AND FINANCIAL INTEREST</u>

Pursuant to Fed. R. App. P. 26.1 and 6th Cir. R. 26.1, Defendants-Appellees

Oakland County and Kyle Jen make the following disclosure:

1.    Are said parties a subsidiary or affiliate of a publicly-owned corporation?
No.


2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?


No.


                            Respectfully submitted,

                            s/ Christopher M. Trebilcock

                            Christopher M. Trebilcock (P62101)
                            Brian D. Shekell (P75327)
                            CLARK HILL PLC
                            500 Woodward Avenue, Suite 3500
                            Detroit, MI  48226
                            (313) 965-8300
                            ctrebilcock@clarkhill.com
                            bshekell@clarkhill.com
                            *Attorneys for Defendants-Appellees*
                            *Oakland County and Kyle Jen*

2

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................5

STATEMENT REGARDING ORAL ARGUMENT ...............................8

JURISDICTIONAL STATEMENT ......................................................9

STATEMENT OF THE ISSUE............................................................10

STATEMENT OF THE CASE..............................................................11

SUMMARY OF ARGUMENTS ..........................................................13

FACTUAL BACKGROUND................................................................17

    A.    Appellees/Defendants Oakland County and Kyle Jen ............................17

    B.    Appellant/Plaintiff David Hieber ............................................17

    C.    County Policies Applicable to Hieber's Employment ............................18

    D.    Hieber's Subordinate Employee Complains About Offensive Remarks.20

    E.    The County Implements a Voluntary Early Retirement Program ...........23

    F.    The County's Equalization Department Votes to Unionize ...................24

    G.    The County Investigates a New Complaint About Hieber ......................25

    H.    Hieber is Placed on Administrative Leave...............................................30

    I.    Hieber is Provided Notice of the County's Intent to Terminate His Employment ...........................................................................31

    J.    Hieber is Provided a Loudermill Hearing ...................................................32

    K.    Hieber Appeals the Decision to Terminate His Employment to the PAB 34

LEGAL ARGUMENT...........................................................................37

    I.    Standard of Review ..........................................................................37

    II.    Hieber's Age Discrimination Claims Fail as a Matter of Law and are Unsupported by the Record...................................................................38

    A.    Hieber's § 1983 Age Discrimination Claim is Preempted.....................38

    B.    Hieber Cannot Establish a Prima Facie Case of Age Discrimination......39

    1.    Hieber was not replaced by someone younger than him, and Paris is not a proper comparator to Hieber. ...........................................................41

2.  Hieber cannot establish a prima facie case based on any adverse action other than his termination.................................................................45

a.  The Retirement Incentive Plan is not discriminatory. .........................46

b.  Placing Hieber on leave is not an adverse employment action. ...........46

c.  "Defamatory" remarks in emails and decision vis-à-vis the purported settlement are not adverse employment actions.............................................47

C.  The Articulated Reasons for Hieber's Suspension and Termination Were Not Pretext for Discrimination.............................................................47

III.  Hieber's Political Affiliation Retaliation Claim Also Fails. ........................53

IV.  Hieber Cannot Establish a Violation of Due Process.................................57

A.  Hieber Received Sufficient Pre-Termination Due Process.....................58

1.  The formal Loudermill hearing provided Hieber with sufficient due process. ...................................................................................58

2.  Hieber's investigation interview also and independently provided Hieber with sufficient due process. ...............................................................59

B.  The Personnel Appeal Board Hearing Provided Hieber with Due Process. ....62

1.  The County was under no obligation—legal or otherwise—to subpoena witnesses. ...................................................................................63

2.  Due process required the explanation of evidence only. .........................65

3.  There is no evidence of a conflict of interest. .........................................66

V.  Hieber Does Not Have a Viable Claim of Defamation. ..............................67

A.  At Most, Jen's Emails Contain Statements of Opinion and Relate to Future Events and are Therefore Not Defamatory............................................68

B.  Jen's Emails are Protected by Qualified Privilege..................................71

VI.  Jen is Entitled to Qualified Immunity. ........................................................74

CONCLUSION................................................................................................75

ADDENDUM ...............................................................................................788

# INDEX OF AUTHORITIES

**Cases**

*Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496 (6th Cir. 2007)...........37, 40

*Adams v. Lucent Techs., Inc.*, 284 F. App'x 296 (6th Cir. 2008)......................................46

*Alspaugh v. Comm'n on Law Enforcement Standards*, 246 Mich. App. 547; 634 N.W.2d 161 (2001)..............................................................................................................47

*Bhama v. Mercy Mem'l Hosp. Corp.*, 416 F. App'x 542 (6th Cir. 2011)........................50

*Blick v. Ann Arbor Pub. Sch. Dist.*, 516 F. Supp. 3d 711 (E.D. Mich. 2021) ..................47

*Bluegrass Dutch Tr. Morehead, LLC v. Rowan Cty. Fiscal Court*, 734 F. App'x 322 (6th Cir. 2018)..............................................................................................................54

*Brazil v. Michigan Dep't of Corr.*, 570 F. Supp. 2d 944 (E.D. Mich. 2008)....................60

*Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72 (6th Cir. 2020).........................................51

*Bruckner v. City of Highland Park*, 901 F.2d 491(6th Cir. 1990).....................................60

*Burzynski v. Cohen*, 264 F.3d 611 (6th Cir. 2001) ............................................................40

*Carter v. W. Rsrv. Psychiatric Habilitation Ctr.*, 767 F.2d 270 (6th Cir. 1985).........62, 66

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)....................................................................37

*Cenveo Corp. v. CelumSolutions Software GMBH & Co. KG*, 504 F. Supp. 2d 574 (D. Minn. 2007) ......................................................................................................69

*City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244 (6th Cir. 1994) ...................................38

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)............................................57

*Couch v. Schultz*, 193 Mich. App. 292, 483 N.W.2d 684 (1992)......................................72

*Dye v. Off. of the Racing Comm'n*, 702 F.3d 286 (6th Cir. 2012) .....................................53

*Eckerman v. Tenn. Dept. of Safety*, 636 F.3d 202 (6th Cir. 2010) ....................................53

*Equitable Life Assur. Soc'y v. Poe*, 143 F.3d 1013 (6th Cir. 1998) ..................................37

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998)....................43

*Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004)………………………………57, 62

*Fink v. Genesee, Cnty. of. See*, 2023 WL 3571915 (E.D. Mich. May 19, 2023) ........39, 40

*Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009) .......................................................40

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)............................................................70

*Graves v. Fleetguard, Inc.*, 198 F.3d 245 (6th Cir. 1999).................................................46

*Greggs v. Andrews Univ.*, 2003 WL 1689619 (Mich. Ct. App. Mar. 27, 2003)..............73

*Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711 (6th Cir. 2006) ....................48

*Grosjean v. First Energy Corp.*, 349 F.3d 332 (6th Cir. 2003)........................................41

*Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399 (6th Cir.1992) ........................................59

*Guilbeaux v. City of Detroit*, 2020 WL 8836924 (E.D. Mich. Nov. 23, 2020)................39

*Hall v. Tollett*, 128 F.3d 418 (6th Cir. 1997)....................................................................55

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982).......................................................................74

*Hawkins v. Mercy Health Services, Inc*, 230 Mich. App 315, 583 N.W.2d 725 (1998)...68

*Hilliard v. U.S. Postal Serv.*, 814 F.2d 325 (6th Cir.1987) ................................. 38

*Hodgins v. Times Herald Co.*, 169 Mich. App. 245 (1988) ............................... 69

*Hope-Jackson v. Washington*, 311 Mich. App. 602 (2015) ................................ 69

*Ivezaj v. Detroit Pub. Sch.*, 2015 WL 7294576 (E.D. Mich. Nov. 19, 2015) .................. 57

*Kelly v. Warren County Bd. of Comm'rs*, 396 F. App'x 246 (6th Cir. 2010) ............ 38, 55

*Kevorkian v. American Med Ass'n*, 237 Mich. App. 1, 602 N.W.2d 233 (1999) ............ 68

*Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897 (8th Cir. 2000) ................................. 62

*Krohn v. Sedgwick James of Mich., Inc.*, 244 Mich. App. 289, 624 N.W.2d 212 (2001). 52

*Lakeshore Cmty. Hosp., Inc. v. Perry*, 212 Mich. App. 396, 538 N.W.2d 24 (1995).......... 70

*Lautermilch v. Findlay City Sch.*, 314 F.3d 271 (6th Cir. 2003).....................................,  40

*Levin v. Madigan*, 692 F.3d 607 (7th Cir. 2012) .................................................. 39

*Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580 (6th Cir. 2014)................................ 50

*Lyons v. Metropolitan Gov't of Nashville & Davidson Cty.*, 416 F. App'x 483 (6th Cir. 2011)......................................................................................................... 40

*Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106 (6th Cir. 2001) ............... 50

*Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911 (6th Cir. 2013) ........ 44

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ....................... 37

*Mayday v. Public Libraries of Saginaw*, 480 F.3d 815 (6th Cir. 2007) ........................... 50

*Mazloum v. Bemis*, No. 336930, 2018 WL 3244136 (Mich. Ct. App. July 3, 2018)........ 72

*McDaniel v. Princeton City Sch. Dist. Bd. of Educ.*, 45 F. App'x 354 (6th Cir. 2002)..... 61

*McNeill-Marks v. MidMichigan Med. Ctr. Gratiot*, 316 Mich. App. 1, 16, 891 N.W.2d 528 (2016).................................................................................................. 48

*Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992) .................................. 43, 44

*Nuyen v. Slater*, 372 Mich. 654, 127 N.W.2d 369 (1964)............................................ 71

*Ocasio-Hernandez v. Fortuño-Burset*, 777 F.3d 1 (1st Cir. 2015) .................................... 54

*Partlo v. Clarkston Cmty. Sch.*, No. 06-11023, 2007 WL 269447 (E.D. Mich. Jan. 26, 2007).................................................................................................... 60

*Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806 (6th Cir. 2011) .............................. 41, 51

*Prysak v. R. L. Polk Co.*, 193 Mich. App. 1, 483 N.W.2d 629 (1992).............................. 72

*Raspberry v. Madison Dist. Pub. Sch.*, 2023 WL 3632712 (E.D. Mich. May 24, 2023). 54, 55

*Rhoades v. Standard Parking Corp.*, 559 F. App'x 500 (6th Cir. 2014) .......................... 49

*Rich v. City of Mayfield Heights*, 955 F.2d 1092 (6th Cir. 1992) ................................. 74

*Richardson v. Wal-Mart Stores, Inc.*, 836 F.3d 698 (6th Cir. 2016)................................. 50

*Roboczkay v. City of Taylor*, 2019 WL 6254870 (E.D. Mich. Nov. 22, 2019)................ 69

*Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532 (6th Cir. 2014).................................. 10

*Rosenthal v. Nat'l Beverage Corp.*, 202 F. Supp. 3d 700 (E.D. Mich. 2016).................. 48

*Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121 (6th Cir. 1998)............................. 46

*Siddiqui v. Gen. Motors Co.*, 2012 WL 335680 (Mich. Ct. App. Feb. 2, 2012).............. 68

*Smith v. Fergan*, 181 Mich. App. 594, 450 N.W.2d 3 (1989)........................................... 71

*Sowards v. Loudon Cnty*, 203 F.3d 426 (6th Cir. 2000)......................................................53

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ......................................................48

*Stewart v. Esper*, 815 F. Appx. 8 (6th Cir. 2020)............................................................47

*Sullivan v. River Valley Sch. Bd.*, 1997 WL 33344778 (Mich. Ct. App. July 11, 1997) ..73

*Tudor v. Macomb Cnty.,* 2021 WL 2026116 (Mich. Ct. App. May 20, 2021) ................46

*United States v. Diebold, Inc.*, 369 U.S. 654 (1962) ........................................................37

*Wegener v. Covington*, 933 F.2d 390 (6th Cir. 1991) ......................................................74

*Wrenn v. Gould,* 808 F.2d 493 (6th Cir. 1987)................................................................44

**Rules**

Fed. R. Civ. P. 56(c) ............................................................................................................37

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-Appellees respectfully request oral argument in this matter because, in addition to the briefs and record on file, oral argument would aid in the decisional process and may help the Court to better understand how and why Plaintiff-Appellant's claims fail as a matter of law. Fed. R. App. P. 34(a).

## JURISDICTIONAL STATEMENT

Defendants-Appellees agree with Plaintiff-Appellant's Jurisdictional Statement with respect to Plaintiff-Appellant's appeal of the lower court's Opinion and Order Granting Defendants-Appellees' Motion for Summary Judgment (ECF No. 63) and the Judgment entered in this action on March 27, 2024 (ECF No. 79).[1]

---

[1] Hieber also filed a Notice of Appeal of the lower court's Opinion and Order Denying Motion to Enforce Settlement (ECF No. 77). Hieber has not raised any arguments regarding the enforcement of a purported settlement or otherwise relating to that appeal. Any such arguments are therefore waived. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 540 (6th Cir. 2014) (An "appellant abandons all issues not raised and argued in its initial brief on appeal") (quoting *United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006)).

## STATEMENT OF THE ISSUE

SHOULD THIS COURT AFFIRM THE DECISION OF THE DISTRICT COURT TO GRANT DEFENDANTS-APPELLEES' MOTION FOR SUMMARY JUDGMENT AND DISMISS PLAINTIFF-APPELLANTS COMPLAINT WITH PREJUDICE WHERE PLAINTIFF FAILED TO PROFFER EVIDENCE TO SUPPORT THE CLAIMS HE HAS ASSERTED IN THIS LAWSUIT?

       Defendants-Appellees answer: Yes

       Plaintiff-Appellant answers: No

       The District Court presumably answers: Yes

       This Court should answer: Yes

## STATEMENT OF THE CASE

This is an employment case related to Plaintiff-Appellant David Hieber's termination from Oakland County (the "County"). Hieber's five-count Amended Complaint alleged claims of age discrimination under 42 U.S.C. § 1983 and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") (Counts I and II, respectively), denial of due process (Count III), retaliation based on political affiliation in violation of the First Amendment (Count IV), and defamation (Count V). After extensive discovery and motion practice, the District Court correctly dismissed all counts with prejudice.

Hieber was hired by the County in 1994 and served as the Equalization Officer—the highest position in the Equalization Department—for approximately 19 years. His employment was terminated by the County at age 51 following an investigation into an October 2021 complaint the County received from one of Hieber's subordinate employees about Hieber's inappropriate conduct and language in the workplace. This was the second formal complaint the County received about Hieber's workplace behavior in the one year prior to his termination, which coincided with a new County Administration coming to power after over 30 years of control by Republican L. Brooks Paterson and his chosen appointees.

During the 2021 investigation, several of Hieber's subordinate employees were interviewed. The interviewees disclosed that Hieber created a toxic and

intimidating workplace, including making a myriad of offensive comments that violated the County's Non-Discrimination Policy. Several testified that the only felt comfortable coming forward because of the recent Union representation election and change of County Administration that was perceived to have protected Hieber in the past. Given the concerning facts that were revealed during the early stages of the investigation, Hieber was placed on paid administrative leave pending outcome of the investigation.

Upon the conclusion of the investigation, the County determined that Hieber's comments and behavior constituted serious violations of the County's Merit System Rules, and employees disclosed that they did not feel safe working with Hieber. Accordingly, the County decided to terminate Hieber's employment. Pursuant to the County's Merit System Rules, Hieber benefited from the ability to challenge the decision before the County's Personnel Appeals Board – which he did until voluntarily terminating the process and filing this lawsuit.

Hieber's defamation claims arise from the undisputed facts that during in the course of Hieber's suspension and termination, Defendant-Appellant Kyle Jen, Hieber's supervisor and the County's Director of Management and Budget, sent two emails limited to employees reporting to Hieber, explaining Hieber's leave and eventual termination. These emails contained factually correct safety protocols put in place by the County as a result of concerns about Hieber's threatening behavior

that were raised during the investigation.

Despite raising age and political affiliation discrimination claims, during his deposition, Hieber testified that he does not believe his age and political affiliation motivated his termination or any other complained-of action. Moreover, in effectuating Hieber's termination, the County provided Hieber with a pre-termination *Loudermill* hearing, as well as an evidentiary-style post-termination hearing. Hieber unilaterally terminated the post-termination hearing before the County completed the presentation of its case and Hieber had the opportunity to present his, which would have included live witness testimony and the introduction of other evidence.

## SUMMARY OF ARGUMENTS

Appellees Oakland County and Kyle Jen terminated Hieber's employment after a thorough investigation into a second complaint about Hieber's workplace conduct, which revealed that Hieber violated the County's Merit Rules multiple times. In an attempt to overcome this, Hieber places an outsized and irrelevant reliance on comments and beliefs held by Brian Paris, Hieber's subordinate, and the County's Deputy County Executive and Human Resource Manager, April Lynch, who was not: 1) in Hieber's "chain of command," 2) the decision maker with respect to Hieber's suspension and termination, or 3) involved in Hieber's pre- and post-termination hearings. As a matter of law, these cannot sustain his claims.

As an initial matter, Hieber's claim that he was discriminated against on the basis of his age in violation of §1983 (Count I) is preempted by the Age Discrimination in Employment Act.

Beyond this failing, Hieber's admissions during his deposition are fatal to his claims of age discrimination and political affiliation retaliation (Counts I, II and IV). During his deposition, Hieber provided no actual evidence beyond mere conjecture and speculation that his age and political affiliation motivated his termination or any other complained-of action. Hieber Transcript, R. 63-2, PageID.731-732 at 129:2-131:3. To establish his *prima facie* cases of age discrimination and political affiliation retaliation, Hieber must establish a causal connection between his age and/or affiliation with the former County administration. As he cannot, the lower court was right to grant summary judgment.

Moreover, Hieber was terminated after a thorough investigation revealed that he created a toxic and intimidating workplace—a result fully supported by the well-documented and substantiated complaints by multiple employees. Appellees' reasons for terminating Hieber were therefore not pretext for discrimination or retaliation.

Hieber's defamation claim was also rightly dismissed on summary judgment (Count V). Hieber bases his defamation claim on two emails sent by Jen to employees in the Equalization Department, informing them of Hieber's

14

administrative leave and eventual termination. As an initial matter, Jen is immune from any liability with respect to Hieber's defamation claim, as are his communications to Equalization Department employees. Additionally, Hieber failed to identify any language in the subject emails that was false or defamatory. Nor could he. These emails contained factually correct safety protocols put in place by the County as a result of concerns about Hieber's threatening behavior. Hieber's personal and self-serving interpretation of what he believes the emails "imply" about his hypothetical future conduct are insufficient to avoid summary judgement.

Hieber's due process claim (Count III) is similarly devoid of factual or legal support. In effectuating his termination, the County followed its two-step termination process. The County thoroughly interviewed Hieber in connection with the 2021 investigation and provided Hieber with a *Loudermill* hearing, during which the County informed him of the basis of his termination. The *Loudermill* hearing was conducted in accordance with the law and County rules regarding pre-termination proceedings. After the *Loudermill* hearing, the County's rules permitted Hieber to have a hearing before the County's Personnel Appeal Board, during which he could admit evidence, put on witnesses, cross-examine the County's witnesses, and otherwise attempt to refute the County's bases for terminating his employment. In sum, the County provided him with sufficient due process.

Fatal to his due process claim is the undisputed fact that Hieber unilaterally

withdrew from the PAB process after the first day of the (anticipated) multi-day hearing and called off the remainder of the hearing. That is, Hieber argues that he was not afforded due process after terminating the very process through which he would have been afforded the due process to which he claims he was entitled.

In sum, the District Court correctly reviewed the record and dismissed all counts of Hieber's Amended Complaint with prejudice. There is no error, and the District Court's decision should be affirmed.

## FACTUAL BACKGROUND

### A. Appellees/Defendants Oakland County and Kyle Jen

Oakland County (the "County") is situated in southeast Michigan and is the state's second most populous county. Its government is currently led by County Executive David Coulter, a position he has held since 2019. Coulter succeeded L. Brooks Patterson, who served as the County Executive from 1992 until his death in 2019. Following Patterson's death, many Oakland County employees stayed on to serve under the new Coulter administration. *See, e.g.,* Bertolini Transcript, R. 63-4, PageID.872-873 8:22-12:18, PageID.887 at 66:24-69:4; Van Pelt Transcript, R. 63-5, PageID.912 at 9:2-4; Fisher Transcript, R. 63-6, PageID.939 at 7:3-4; Wood Transcript, R. 63-7, PageID.959 at 4:2-3.

On December 20, 2020, Kyle Jen was appointed to be the County's Chief Financial Officer. In this role, Jen was responsible for overseeing, among other things, the County's Equalization Department. Jen Transcript, R. 63-3, PageID.844 at 6:16-7:18. At the time of his termination, Hieber reported to Jen. Hieber Transcript, R. 63-2, PageID.718 at 75:5-8.

### B. Appellant/Plaintiff David Hieber

Hieber was hired by the County in 1994, where he remained continuously employed until his termination in November 2021. Hieber Transcript, R. 63-2,

PageID.720 at 83:4-84:8. For the last 19 years of his employment, Hieber held the position of Equalization Officer. *Id.* at PageID.717 at 70:10-16.

At all times during his employment with the County, Hieber was considered a "Merit System employee." *Id.* at 84:20-85:3. As a Merit System employee, Hieber was not a political employee. Rather, Hieber held an apolitical position where politics was kept "very far away from the day-to-day." Bertolini Transcript, R. 63-4, PageID.895 at 98. As a long-time member of County leadership, Phil Bertolini testified, while Hieber was undoubtedly "part" of the Patterson administration by way of his tenure with the County, he was never "labeled as being one of Brooks' guys." *Id.* at PageID. 894-895 at 97:14-98:20.

### C. County Policies Applicable to Hieber's Employment

As a Merit System Employee, Hieber was subject to the County's Non-Discrimination policy. Non-Discrimination Policy, R 63-14 PageID.1059. The Non-Discrimination Policy, which sets forth the County's commitment to equal employment opportunity rights, states that "[a]ll County Employees and Contractor Employees are expected to conduct themselves in a manner that will ensure compliance with County policies and promote a work environment free from illegal discrimination or harassment. To abuse the dignity of anyone through racial, sexual, ethnic slurs, or other objectionable remarks or conduct is a violation of this Policy." *Id.*

18

Hieber was also subject to the County's Merit Rules, which permit disciplinary action when a "cause" event occurs. *Id.* PageID.1061-64. Included in the non-exhaustive list of events that establish cause for disciplinary action are:

> 8.3.0.7 Conduct or performance on the job which demonstrates a deliberate attempt to cause poor morale or disrespect among County employees by actions or attitude on the job.

> 8.3.0.12 The willful violation of any reasonable Department or County rule or regulation which has been adopted in written form and is known or reasonably should be known to the employees involves.

*Id.* PageID.1063-64.

The County also has termination policies through which Merit System employees (like Hieber) could have termination decisions reviewed. Consistent with the United States Supreme Court decision in *Loudermill v. Cleveland Board of Education*, the County has a Pre-Termination Hearing policy. PAB Rules, R. 64-19; Notice of Intent to Dismiss, R. 64-15.

Through this policy, Merit System employees subject to dismissal are entitled to: (1) written notice of the charges, (2) continuation of pay during the pre-termination hearing process unless the employee is on an unpaid leave or suspended without pay, (3) an explanation of the employer's evidence, and (4) an opportunity for the employee to respond to the charges. *Id.* As the policy clearly states, however,

"[a] pre-termination hearing <u>shall not</u> be construed as a full evidentiary hearing." *Id.* PageID.1354 (emphasis in original).

In the event a Merit System employee's termination is upheld at the conclusion of the pre-termination hearing, the employee has the right to appeal the decision to the County's Personnel Appeal Board ("PAB"). PAB Rules, R. 64-19, PageID.1392-1402. The PAB, which is comprised of three members – an employee elected Appeal Board member, a Board of Commission member, and a Member at Large – conducts a hearing to review the termination decision. *Id*.

### D. Hieber's Subordinate Employee Complains About Offensive Remarks

On or around September 1, 2020, Hieber led a meeting over Zoom with the Equalization Department's chiefs and supervisors, all of whom reported to him in some capacity. Among those who participated in the meeting was one of Hieber's direct reports, Brian Paris, who self-identifies as a gay man. Paris Interview, R. 63-16, PageID.1084.

During the meeting, Hieber received a text from his daughter, which said "something to the effect, 'My math teacher, you know, wants to know what pronouns I prefer.'" Rather than waiting to respond to the text until after the meeting was over, Hieber felt compelled to ask the group, "Why does my daughter's teacher want to know what pronouns he needs to use? My daughter's name is Alexa." Hieber Transcript, R. 63-2, PageID.729 at 120:6-23. Paris was so upset by Hieber's

20

dismissive attitude and tone of "disdain" towards the teacher's inquiry that he left the meeting before it concluded. Paris Interview, R. 63-16, PageID.1079.

Paris subsequently complained about Hieber's comment to the County's Manager of Human Resources, Julie Fisher. In doing so, Paris conveyed that he felt that Hieber's conduct in the meeting was meant to harass and intimidate, rather than promote inclusivity and reflect the County's non-discrimination policy. Concerningly, Paris stated that Hieber's conduct "[was] part of a broader pattern of behaviors that have made it clear to me that Mr. Hieber discriminates against individuals based on age, sex, race, and gender. This pattern of behavior includes comments made in my presence and in the observable hiring practices of Oakland County Equalization." Paris Email October 7, 2024, R. 63-15, PageID.1068-1069. Paris also reported, "Mr. Hieber's bullying is a long-standing problem…I am well aware that I am at great risk by lodging these complaints." *Id.*

The County, through Employee and Labor Relations Specialist Rosie Wood and Risk Management employee Tim Sutherland (both who also served under the Patterson administration), investigated Paris's complaint. During the investigation, Wood and Sutherland interviewed Hieber and the individuals present at the September 1 meeting. During his investigation interview, Paris shared that Hieber's department had not hired a male person of color in the 13 years Paris had worked in Equalization; no men had been hired to work in Equalizations' clerical department;

and Hieber voiced his disapproval about male employees taking paternity leave. Hieber also expressed a clear preference for hiring younger employees, including high school and college students. Paris Email October 19, 2020, R. 63-15, PageID.1075-1077.

The investigation revealed that Paris's feelings about Hieber were shared by other employees, who similarly voiced that there was culture of intimidation in the Equalization Department. Wood Interview, R. 63-17, PageID.1092; Memo, R. 64-1, PageID.1106-1108, 1110-1111. One of these employees, a single mother who expressed her own concerns about intimidation, said she feared that she would be retaliated against for participating in the investigation. Wood Interview, R. 63-17, PageID.1092. Another employee mentioned that she "wouldn't want to be on Hieber's bad list," and yet another said that she had been yelled at by Hieber "many times" and "not talked to for years." Memo, R. 64-1, PageID.1111-1112; Bouchey Interview, R. 64-14, PageID.1330. She likewise stated that it is "absolutely" better to be on Hieber's good side. *Id.* at PageID.1330.

Wood summarized her investigation findings and recommendations in a memorandum to Fisher. Wood determined that Hieber's comment was an "isolated incident" but highlighted that "there does appear to be an area of concern in the Real Property section [of the Equalization Department], causing frustration on many levels within Equalization. If feasible, it is recommended that Encompass assess the

culture of Equalization and provide coaching and/or development for the areas deemed necessary." Memo, R. 64-1, PageID.1114.

Consistent with this recommendation, Hieber admitted he was required to attend coaching sessions to address his management style and "the pronoun deal." Hieber Transcript, R. 63-2, PageID.736 at 148:11-149:14. When asked what he learned from the incident, Hieber testified that he learned "to be more careful" and would "just try to call to call people by their names now as opposed to say, him or her or them." Hieber Transcript, R. 63-2, PageID.737 at 150:3-22. When asked if he learned anything else relative to pronoun use, Hieber testified that he did not. *Id*. Hieber also minimized the importance of the intent of the coaching sessions, noting that the only changes in his management style was asking supervisors if it was necessary to have as many Zoom calls and interacting less with the supervisors. Hieber Transcript, R. 63-2, PageID.736 at 146:16-148:7.

### E. The County Implements a Voluntary Early Retirement Program

In late autumn 2020, the County was in the process of implementing a voluntary Separation and Retirement Incentive Program. The primary goal of the program was to effectuate a 4-5% reduction in personnel costs. Memo re: Retirement Incentive, R. 64-5, PageID.1137. The program would also allow for the implementation of an updated compensation plan and enable the County to "prepare

23

a workforce for the future that is competitive and reflective of the diversity of Oakland County." *Id.*

April Lynch, Deputy County Executive who oversaw the Human Resources Department was tasked with effectuating the program. As Lynch testified, the purpose of the incentive program was to build "a workforce for the future," which would include "all ages" and was not premised on hiring a cadre of younger employees. Lynch Transcript, R. 63-9, PageID.996 at 24:17-25:5. To this end, all full-time employees were eligible to participate in the program, regardless of whether they were or would be eligible to retire during the program application period. Notably, this program was similar to three such programs initiated by the Patterson Administration in 1994, 2003, and 2008. Memo re: Retirement Incentive, R. 64-5, PageID.1137; Van Pelt Transcript, R. 63-5, PageID.932-33 at 87:11-91:11.

Hieber was never told that he had to participate in the program, and ultimately decided he did not want to participate in the entirely voluntary early retirement incentive program. Hieber Transcript, R. 63-2, PageID.837 at 542:8-17; Jen Transcript R. 63-3, PageID.846 at 14:14-22.

### F.  The County's Equalization Department Votes to Unionize

In mid-2021, the Equalization Department employees voted to unionize. Unionizing the department gave Hieber's subordinates "hope that finally someone was going to have their back." Doyle Interview, R. 64-8, PageID.1179.

On July 1, 2021, Hieber called Rob Doyle, the employees' union representative at the time, to discuss the results of the union election, which included a vote that Hieber—as a result of his supervisory position—would not be eligible to be a member of the union. Doyle Interview, R. 64-8, PageID.1187. Hieber conveyed that he was "so mad" about the election results that he began threatening to withhold Department resources. Doyle, who had prior experience in union negotiations, characterized Hieber's call as "classic intimidation." *Id.* at PageID.1188. A few months after Hieber threated Doyle, Doyle raised concerns about the environment that Hieber had created to Fisher. Notably, Doyle went to Fisher rather than filing a union grievance because he was afraid of Hieber. Fisher Transcript, R. 63-6, PageID.943 at 22:11-19.

### G. The County Investigates a New Complaint About Hieber

In the fall of 2021, the County circulated a survey about workplace diversity in the County. The survey did not require employees to input their names in order to complete it (*i.e.*, it was anonymous). Hieber Transcript, R. 63-2, PageID.740 at 162:17-25.

On October 18, 2021, Paris filed a grievance with the newly formed union because days earlier, Hieber was heard by multiple employees "openly bashing" the survey and saying that if he was asked whether he filed it out, he would lie. Paris Email October 18, 2024, R. 64-6, PageID.1141. Paris also complained that Hieber's

"continued behavior…creates a hostile work environment meant to discriminate against vulnerable people cited in the Country's [sic] non-discrimination policy." *Id.* at PageID.1141-1142. Paris further reported that Hieber "has proven that he is incapable of refraining from behavior that seeks to create a hostile and discriminator workplace."

The concerns raised by Paris in the grievance were reported to Fisher by Joe Rozell, who at that time represented the unionized employees. Paris Email October *Id*. After reviewing Paris' grievance, Fisher expressed her disappointment that Hieber continued to intimidate his subordinates and expressed her commitment to creating a safe environment for employees to share their experiences. *Id.*

Based on the complaints in the grievance, the County opened an investigation into Paris's allegations the next day. *Id*. Over the course of the investigation, multiple employees corroborated what Paris reported. This included the allegations that Hieber was discouraging people to take the survey or that he would not be honest about his answers to the survey. McLeod Interview, R. 64-7, PageID.1147, Marshall Interview, R. 64-9, PageID.1204-1205, Doyle Interview, R. 64-8, PageID.1177. Doyle also reported that Hieber spoke to him directly about the survey and said, "If my boss, Kyle Jen, asked me [about the survey] I will lie to him about it." Doyle Interview R. 64-8, PageID.1178. Doyle believed Hieber was worried about the outcome of the survey from his staff because the environment had become toxic and

hostile after 30 years of Hieber "pulling a lot of crap, retaliating against employees. Targeting employees." Doyle Interview R. 64-8, PageID.1170. Equalization Department employees Alex McLeod and Amanda Marshall echoed these sentiments, expressing that they were fearful to participate in the investigation because they did not want any backlash from Hieber.

In addition to the reports about Hieber's response to the survey, other interviewees disclosed deeply disturbing behavior from Hieber that they previously did not feel safe enough to disclose. The statements made during the interviews include:

| Name | Reports about Hieber |
|---|---|
| McLeod | <ul><li>Hieber created "chaos for chaos" R. 64-7, PageID.1157.</li><li>Hieber thought issues about mental health and LGBTQ issues were "stupid." R. 64-7, PageID.1163.</li></ul> |
| Marshall | <ul><li>Hieber "is a psychopath" and "very manipulative." R. 64-9, PageID.1205.</li><li>She had seen Hieber "be maniacal." R. 64-9, PageID.1206.</li><li>Hieber "enjoys that chaos. He likes to create that chaos." R. 64-9, PageID.1206.</li><li>Hieber would make snide remarks about Paris. R. 64-9, PageID.1207-1208</li></ul> |
| Glenn | <ul><li>Hieber said, "'I don't want some flamer working in there" with respect to hiring a man in all female clerical department. R. 64-10, PageID.1241.</li><li>When a woman working in the building started dating a coworker, the coworker informed Hieber of the relationship. Hieber then called Glenn and said something to the effect of "what's the over under" or "what are the odds" of the coworker "blowing his head off," as the woman's previous boyfriend had committed suicide. R. 64-10, PageID.1243-1244.</li></ul> |

27

| | |
|---|---|
| | • Glenn reported, "I actually drove my wife's car here today because it wouldn't surprise me if he would have been sitting in the parking lot wondering who came in. That's how it is." R. 64-10, PageID.1249 |
| Isenberg | • Hieber "thought [the Union] was going to be really great for him and now he's been left out and now he's basically throwing a fit…like a child" R. 64-11, PageID.1253.<br>• Hieber constantly pits people against each other. R. 64-11, PageID.1261.<br>• The County is "a toxic work environment. Especially if you are a Level II and down and lower." R. 64-11, PageID.1267.<br>• Hieber told a subordinate something like, "somebody should just kill them all" in reference to Black Lives Matter protesters. R. 64-11, PageID.1269-1270.<br>• Hieber said, "We've got to be really careful with this one" while rubbing his arm when talking about taking potential disciplinary action against a Black employee. R. 64-11, PageID.1270-1271.<br>• Hieber did not want to hire a single mother because he did not think she could be dependable. R. 64-11, PageID.1272.<br>• Hieber used holiday time off and paternity as a leverage point and though paternity leave was "ridiculous." R. 64-11, PageID.1273 |
| Walsh | • Walsh described the environment as "toxic enough that I need to speak out" despite being afraid to do so. R. 64-12, PageID.1282.<br>• Being on "the negative end of things" with Hieber "would have been a scary thing because I don't know what he would have done." R. 64-12, PageID.1292-1293.<br>• Walsh described the ways in which she was constantly fearful of retribution and retaliation from Hieber. R. 64-12, PageID.1292-1294. "It is like don't make Dad mad. You know. It is we have to survive too. So our survival is dependent upon whether Dave is happy. R. 64-12, PageID.1295.<br>• When asked if she heard Hieber lose his temper and yell, Walsh answered, "Yeah he swears all of the time. F this F that" and described instances where she could hear him raising his voice. R. 64-12, PageID.1302-1303. |

| Meder | • Hieber created a "tense" work environment with "a lot of fear" of retribution. R. 64-13, PageID.1309-1310.<br>• Meder believed Hieber "could have a personality disorder of some sort," especially since he has "big issues" when he cannot control things. R. 64-13, PageID.1314.<br>• Meder admitted that she is afraid of Hieber or what he might do to her. R. 64-13, PageID.1315. |
|---|---|
| Bouchey | • Hieber yelled at Bouchey "many times" and has gone years without talking to her based on a decision she made that he did not approve of. R. 64-14, PageID.1329-1330.<br>• She admitted that it is "absolutely" easier to be on Hieber's good side. R. 64-14, PageID.1330.<br>• Hieber has made Tracy, one of his chiefs, cry, and Bouchey can see why people would describe Hieber as a bully. R. 64-14, PageID.1335. |
| Doyle | • Doyle described that "there could not be more of a toxic, hostile work environment, retaliation, intimidation." R. 64-8, PageID.1170.<br>• Hieber "could not be more like mentally unstable" and "easily could be a freaking shooter." R. 64-8, PageID.1197. Hieber "gets manic" and "could be dangerous." R. 64-8, PageID.1198.<br>• Doyle stated that Hieber has weapons and proposed safety measures to ensure employee safety in the event the County took action against Hieber. R. 64-8, PageID.1197 and 1199.<br>• Doyle's wife was concerned Hieber was going to shoot Doyle. R. 64-8, PageID.1197.<br>• There are "a lot of people" who "think he could come in there and shoot the place up." R. 64-8, PageID.1197. |

During his deposition, Hieber did not deny that he made these comments. Nor did he claim that the employees' fears are unwarranted. In fact, these comments track prior unusual behavior from Hieber, including when he admittedly tracked an

29

employee who he suspected was having an affair with his direct report. Hieber Transcript, R. 63-2, PageID.727 at 110-113. When Hieber suspected that the subordinate was having a relationship with another woman who was a County employee, he took it upon himself to follow the woman when she left work early all the way to his direct report's house. When the woman left work early, Hieber left too, drove behind her, and followed her to his subordinate's house, despite not knowing where she was going. While testifying about this incident, Hieber admitted, "I didn't know I was doing it until I did it." *Id.* at PageID.727 at 114:8.

### H. Hieber is Placed on Administrative Leave

Given employees' grave concerns for their safety they conveyed during the investigation process, the County determined that it was necessary to remove Hieber from the premises. Jen Transcript, R. 63-3, PageID.848 at 22:12-23:18, PageID.848 at 27-28; Lynch Transcript, R. 63-9, PageID.1002 at 50:12-14, 51:20-52:2; Fisher Transcript, R. 63-6, PageID.950 at 52:10-14, PageID.955 at 72:17-73:24; McGabe Transcript, R. 63-12, PageID.1045 at 12, PageID.10458 at 22-23; Wood Transcript, R. 63-7, PageID.970 at 47:22-48:16, PageID.971 at 50:17-19, PageID.970-971 at 52:25-53:13, 54:12-55:18. Accordingly, Hieber was placed on administrative leave on October 21, 2021. Termination Notice, R. 64-22, PageID.1419, Hieber Transcript, R. 63-2, PageID.741 at 168. Hieber was informed of this decision in

person by Fisher, who was accompanied by two plainclothes officers wearing polo shirts and lanyards. Hieber Transcript, R. 63-2, PageID.753 at 214:12-215:17.

Hieber was also provided with written notice of this administrative leave. In it, Hieber was informed that he was not to have contact with subordinate employees, conduct any County business, or come onsite to County property. Termination Notice, R. 64-22, PageID.1419. These restrictions were put in place to ensure employee safety and to prevent Hieber from intimidating employees involved in the investigation. Jen Transcript, R. 63-3, PageID.851-852 at 36:1-37:8.

The next day, Jen sent an email to Equalization Department employees informing them of Hieber's leave in order to ensure the smooth continuation of operations and to remind employees of the protections provided by the Whistleblower Protection Act. Jen Email October 22, 2021, R. 64-17, PageID.1359-1361; Jen Transcript, R. 63-3, PageID.853-856 at 41:6-42:20, and 45:24-53:13; Fisher Transcript, R. 63-6, PageID.947 39:15-40:10. Given the concerning reports by the Equalization Department employees during the investigation, Jen reiterated that it was his "goal to ensure that employees work in a safe environment free of intimidation, coercion, harassment, retaliation or discrimination," and to this end, he also provided safety instructions on where to park, how to enter and exit the building, and calling 911 if they perceived immediate danger. *Id*.

## I. Hieber is Provided Notice of the County's Intent to Terminate His Employment

Based on what was learned during the investigation, Jen determined that it would be appropriate to proceed with terminating Hieber's employment.[2] Jen Transcript, R. 63-3, PageID.850 at 30:17-31:10; Chambers Transcript, R. 63-8, PageID.980 at 5:21-6:1. Consistent with the County's Pre-Termination Hearing policy, the County sent a Notice of Intent to Dismiss to Hieber's attorney, which described comments and behavior by Hieber that were reported during the investigation and an explanation of the Merit System Rules Hieber violated. Hieber Transcript, R. 63-2, PageID.710 at 44:14-45:10, PageID.730 at 122:17-21, PageID.767 at 270:1-12; Notice of Intent to Dismiss, dated November 24, 2021, R. 64-22, PageID.1419. The Pre-Termination Hearing guidelines, which included an explanation of Hieber's *Loudermill* rights were included with the Notice. Notice of Intent to Dismiss R. 64-15, PageID.1354-1356. This included an explanation that Hieber would be entitled to a pre-termination hearing as well as a post-termination Personnel Appeal Board hearing, during which he would have the opportunity to present evidence. *Id.* at PageID.1351; *see also* PAB Rules, R. 64-19, PageID.1392-1402.

### J.  Hieber is Provided a Loudermill Hearing

On November 23, 2021, Hieber, alongside his counsel, participated in his pre-

---

[2] Hieber has never denied that Jen was the sole decision maker with respect to the decision proceed with the termination process.

termination *Loudermill* hearing. During this hearing, Hieber was again informed of the reasons for his termination, and Hieber acknowledged that he had been provided with the County's reasons for his termination. Loudermill Transcript, R. 64-20, PageID.1407-1408 at 4:6-5:15. Hieber and his attorney were provided with the opportunity to make a statement and ask questions. Hieber denied the charged rule violations *Id.* at PageID.1408 5:16-23, and his attorney affirmatively stated that she did not have any questions. *Id.* at PageID.1409 at 6:1-8. They were then reminded that Hieber would have the opportunity to further challenge the action taken through a PAB hearing. *Id.* at 5:16-23, 6:1-8, 6:13-16.[3] In short, the requirements of the Pre-Termination Hearing policy and *Loudermill* were satisfied.

After the *Loudermill* hearing concluded, the County issued a Decision to dismiss Hieber from employment, effective November 23, 2021. Decision Letter, R. 64-21, PageID.1413-1417. The Decision included instructions regarding Hieber's ability to appeal his termination. *Id.*; Hieber Transcript, R. 63-2, PageID.769-770 at 280:1-283:4. Hieber also received a letter informing him of his termination. Ex. 38, Termination Notice, R. 64-22, PageID.1419.

---

[3] Throughout his Brief, Hieber states that the County "falsely" represented that the purpose of the *Loudermill* hearing was to provide notice to Hieber of the reasons for his termination and that he would have an opportunity to plead his case during the PAB hearing. *See, e.g.*, Doc. 36, Pg. 27. Hieber, however, points to nothing to suggest that this was not, in fact, the County's process when terminating Merit System employees.

After Hieber was notified that his employment was being terminated, Jen sent a second email to the Equalization Department, informing them of Hieber's termination and again giving instructions to employees for how to deal with uncomfortable or unsafe situations with Hieber if they were faced with them in the future. Jen Email November 24, 2021, R. 64-23, PageID.1421-1422. Again, Jen wanted to ensure the "physical and psychological safety" of employees. Jen Transcript, R. 63-3, PageID.858-859 at 61:11-67:23; Fisher Transcript, R. 63-6, PageID.942-943 at 20:17-21:13; Lynch Transcript, R. 63-9, PageID.998 at 34:20-35:13.

### K. Hieber Appeals the Decision to Terminate His Employment to the PAB

Hieber ultimately appealed the County's termination decision to the PAB. Hieber Email December 6, 2021, R. 64-24, PageID.1424-1426. During the PAB process, Hieber was afforded a hearing, during which he had the opportunity to present evidence, including live witness testimony, to refute the County's reasons for his termination. PAB Rules, R. 64-19, PageID.1392-1402; Woodward Transcript R. 63-10, PageID.1009 at 15:13-16:2. Hieber Transcript, R. 63-2, PageID.791 at 359:6-22. Hieber's PAB panel consisted of Commissioner David Woodward, Barry Lepler, and Gloria Harsten Spann. *See* Ex. 41, PAB Transcript, R. 64-25 PageID.1428. Lepler and Harsten Spann are not County employees, and there is no record evidence that Lepler was provided with information about Hieber outside the

PAB process, discussed Hieber or this PAB with anyone else at the County outside of the hearing (including Chambers), or was otherwise biased against Hieber. Chambers Transcript, R. 63-8, PageID.985-987 at 25:12-30:7, 32:6-35:6; Woodward Transcript R. 63-10, PageID.1011 at 21:1-22:4. Additionally, Hieber did not seek to have any of the panel members disqualified, which was possible under the Procedural Guidelines for Conducting Personnel Appeal Board Hearings. PAB Rules, R. 64-19, PageID.1393.

Ahead of the PAB hearing, Hieber contacted ten potential witnesses, including current employees of the County, and obtained at least 4 witness statements. Hieber Transcript, R. 63-2, PageID.778-79 at 308:20-309:7, PageID.786 at 337:15-339:5 and 339:11-340:19; Hain Transcript R. 63-11, PageID.1029-1030 at 9:18-10:22; Bertolini Transcript R. 63-4, PageID.890 at 80:10-22; Witness Statements, R. 64-26 PageID.1500-1509; Text Messages from Hieber, R. 64-27, PageID.1511.

Hieber's PAB hearing was originally scheduled for December 20, 2021. However, the County agreed to move the hearing to allow Hieber to meaningfully prepare with his new counsel. Hieber Transcript, R. 63-2, PageID.791 at 357:5-19, PageID.791 at 373: 16-23. At Hieber's counsel's request, the County also agreed to hold the hearing over Zoom. *Id*. at PageID.812-813 at 444:1-445:17, PageID.839 at 551:17-552:19.

During the first day of the PAB hearing, the County explained its lack of subpoena power with respect to witnesses. Consistent with the PAB Rules, the panel members also requested that all testimony come from witnesses, rather than through affidavits. PAB Transcript, R. 64-25 PageID.1441-1443 at 14:14-16:14; Woodward Transcript R. 63-10 PageID.1014-1015 at 36:1-37:15. Notably, Woodward made it clear that those witnesses who submitted affidavits would have the opportunity to provide live testimony before the PAB, and the County's corporation counsel indicated that he would contact Hieber's intended witnesses and inform them that the County was not prohibiting them from testifying. PAB Transcript, R. 64-25, PageID.1437, 1441. Prior to the PAB, corporation counsel also reassured Hieber's counsel that he would "make all efforts possible" to ensure witness cooperation for Hieber. Mastromarco Email January 10, 2022, R. 64-28, PageID.1513.

Both sides made opening statements, and the County put on Brian Paris as a witness, who Hieber's counsel cross-examined. PAB Transcript, R. 64-25, PageID.1446-1454, PageID.1456-1484. However, the PAB hearing was not completed in one day due to time constraints, and due to limitations from both sides, the parties were unable to reschedule the second day of the PAB hearing until a later date. *Id.* at PageID.1493 at 66:3-21.

Hieber decided to not complete the PAB hearing, calling it a "waste of time." Hieber Transcript, R. 63-2, PageID.797 at 383:9-384:2, PageID.839 at 550:14-19.

36

The PAB process, therefore, concluded given Hieber's unilateral and voluntary withdrawal from the process.

## LEGAL ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *Equitable Life Assur. Soc'y v. Poe*, 143 F.3d 1013, 1015 (6th Cir. 1998). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" as to an essential element of the non-moving party's case. Fed. R. Civ. P. 56(c). All "inferences to be drawn from the underlying facts… must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment must be granted if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

It is insufficient, however, simply to show "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *Abdulnour*

*v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 501 (6th Cir. 2007). "[M]ere speculation does not create a genuine issue of material fact to overcome summary judgment." *Kelly v. Warren County Bd. of Comm'rs*, 396 F. App'x 246, 250 (6th Cir. 2010).

This Court may also affirm the decision of the lower court for reasons other than those articulated in granting summary judgment. *See, e.g., City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 251 (6th Cir. 1994).

## II. HIEBER'S AGE DISCRIMINATION CLAIMS FAIL AS A MATTER OF LAW AND ARE UNSUPPORTED BY THE RECORD.

The Complaint asserts claims for age discrimination claim under two separate legal theories: 1) violation of 42 U.S.C. § 1983 and the 14th Amendment, and 2) violation of the Michigan Elliott-Larsen Civil Rights ("ELCRA"). The District Court correctly dismissed both claims.

### A. Hieber's § 1983 Age Discrimination Claim is Preempted.

While the lower court did not address the viability of Hieber's age discrimination claim pursuant to the 14th Amendment and 42 U.S.C. §1983 as a matter of law, this Court can—and should—find that this claim is preempted by the Age Discrimination in Employment Act ("ADEA"). *Hilliard v. U.S. Postal Serv.*, 814 F.2d 325, 326 (6th Cir.1987), *overruled in part on other grounds*, ("The court may affirm on any ground supported by the record even though the grounds relied

on by the district court are different from the ones outlined by the appellate court.").

The First, Third, Fourth, Fifth, Tenth, and D.C. Circuits have all held that Congress intended the ADEA to be the exclusive remedy for claims of age discrimination in employment. *Guilbeaux v. City of Detroit*, 2020 WL 8836924, at *11 (E.D. Mich. Nov. 23, 2020), *report and recommendation adopted*, No. 19-13728, 2021 WL 508425 (E.D. Mich. Feb. 11, 2021) (collecting cases and summarizing a circuit split)); *see also Fink v. Genesee, Cty. of. See*, 2023 WL 3571915, at *9-10 (E.D. Mich. May 19, 2023), *reconsideration denied*, 2023 WL 4408438 (E.D. Mich. July 7, 2023) (brought by Hieber's counsel and granting summary judgment of the plaintiff's §1983 age discrimination claim). The Seventh Circuit, however, has held otherwise. *See id.* (citing *Levin v. Madigan*, 692 F.3d 607, 617 (7th Cir. 2012)).

The Sixth Circuit has not ruled on this issue. However, in the event it addresses this issue in the instant appeal, Appellees respectfully request that the Sixth Circuit join the well-reasoned decisions of the First, Third, Fourth, Fifth, Tenth, and D.C. Circuits and likewise hold that a §1983 age discrimination is preempted by the ADEA. Because Hieber never filed a claim for age discrimination under the ADEA, his federal age claim should be dismissed as a matter of law.

### B.  Hieber Cannot Establish a Prima Facie Case of Age Discrimination.

Even if the Court were not inclined to dismiss Hieber's §1983 claim as

preempted, that claim, as well as his ELCRA claim, still fail.

On appeal, Hieber does not assert that his age discrimination claims are based on direct evidence of discrimination. Accordingly, the parties agree that Hieber's ELCRA claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *See* Appellant's Brief, Doc. 36, Pg. 35, 40-41; *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009); *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir. 2001).[4]

To establish a *prima facie* case of age discrimination, Hieber must establish: 1) that he was a member of a protected class; 2) that he suffered an adverse employment action; 3) that he was qualified for the position held; and 4) that he was replaced by someone outside of the protected class or that he was treated differently than a similarly situated, non-protected employee. *Abdulnour*, 502 F.3d at 501-02 (6th Cir. 2007); *Lyons v. Metropolitan Gov't of Nashville & Davidson Cty.*, 416 F. App'x 483 (6th Cir. 2011) . Were he to do so, the burden of proof shifts to Appellees to articulate a nondiscriminatory reason for their action (i.e., termination). *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir. 2001). If Appellees make this showing, the burden then shifts back to Hieber to establish that Appellees' stated reason(s) was a

---

[4] Hieber's § 1983 age discrimination claim would be analyzed under the same burden-shifting framework, were it not preempted. *See Lautermilch v. Findlay City Sch.*, 314 F.3d 271, 275 (6th Cir. 2003); *see also Fink v. Genesee, Cty. of. See* 2023 WL 3571915, at *9-10 (E.D. Mich. May 19, 2023), *reconsideration denied*, 2023 WL 4408438 (E.D. Mich. July 7, 2023).

pretext for age discrimination. *Id.* In so doing, Hieber must prove that age-related discriminatory animus was a "substantial" or "motivating" factor for the adverse employment action decision. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011).

Hieber limits his arguments on appeal to two issues: 1) whether he can satisfy the fourth element of his *prima facie* case and 2) whether Appellees' reasons for terminating him were pretext for discrimination. In particular, he argues that the lower court failed to adequately consider how Appellees treated Hieber versus how they treated a supposedly similarly situated, younger employee—Paris. Hieber's arguments are legally infirm and factually unsupported.

### 1. Hieber was not replaced by someone younger than him, and Paris is not a proper comparator to Hieber.

After Hieber was terminated, the County hired Michael Lohmeier as its new Equalization Officer. Young Transcript R. 63-13, PageID.1052 at 4:2-25; Woodward Transcript R. 63-10, PageID.1012 at 26:11-25. Lohmeier is one year older than Hieber. Declaration of Angie Broegman-Stinde, R. 64-29, PageID.1515; *see also* Young Transcript R. 63-13, PageID.1053 at 5:1-5; Hieber Transcript, R. 63-2, PageID.704 at 18:12-15. As this Court has previously held, "in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003). As Hieber was

41

*younger* than his replacement, it stands to reason that he cannot establish the fourth element of his claim by showing that he was replaced by someone younger.

Hieber also cannot establish the fourth element of his claims by showing that a younger employee engaged in the same or similar conduct and was not subject to an adverse employment action.

Hieber attempts to rely on a comment Paris allegedly made to his coworker, Ashley Young, about individuals who were bisexual. Appellant's Brief Doc. 36, Pg. 37-43. Young complained about this unsubstantiated comment to Wood, *who then investigated the complaint*. Wood Transcript R. 63-7, PageID.961-962 at 12:7-14:21 ("Q [from Hieber's counsel]: Did Ashley Young ever make a complaint **that you investigated** concerning Mr. Paris? A: Yes" (emphasis in the original)). Upon receiving Young's "she said-he said" complaint, Wood interviewed Paris, who denied making the comment.  Wood Transcript R. 63-7, PageID.962 at 14:15-25. Given the absence of any additional proof, Wood was unable to determine the veracity of Young's complaint. Ultimately, Paris was not disciplined for making the comment, but it was noted in his file. *Id*. This was akin to the investigation into Paris's 2020 grievance, which was investigated by the County by interviewing only those individuals who heard Hieber's comment, determined to be non-discriminatory, and did not result in any discipline of Hieber. Hieber Transcript, R. 63-2, PageID.732 at 131:5-132:25.

42

Hieber, however, does not compare the first September 2020 investigation into his comments and the first investigation into a comment by Paris to be appropriate. *Id*. He instead believes that the appropriate comparison is between Young's complaint about Paris and Paris's 2021 grievance, which referenced the survey (among other behavioral issues). Specifically, Hieber argues 1) his investigated conduct was on par with Paris's alleged one-off comment to one co-worker and 2) Appellees supposedly failed to investigate Paris's purportedly similar conduct, while it did investigate the complaint about Hieber.

As an initial matter, Hieber's argument fails because the County *did* investigate Paris's comment.  Second, Hieber cannot show that he and Paris are similarly situated in all *relevant* respects, and therefore are proper comparators. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). To show that they are "similarly situated," Hieber must establish that he and Paris (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Id.* (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992)). As this Court has held, "[W]e look to similarly situated employees not to evaluate the employer's business judgment, but to inquire into the employer's "motivation and intent" to determine whether the employer was "motivated by retaliation." *Wrenn v.*

*Gould,* 808 F.2d 493, 502 (6th Cir. 1987).

First, Paris and Hieber did not share a supervisor. Rather, <u>Hieber *was* one of</u> <u>Paris's supervisors</u>. This alone is dispositive of whether Hieber and Paris are similarly situated. Second, while Appellees maintain that Paris did not receive any "special treatment," holding an employee who oversaw an entire department (such as Hieber) to a higher standard than a subordinate is permissible. *See Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 917 (6th Cir. 2013) (affirming summary judgment of a managerial employee's discrimination claim where the employee was unable to identify a proper comparator because "[appellant's] role as a manager at Cracker Barrel could reasonably justify holding her to a more stringent standard of conduct than that applied to [a potential comparator] who holds the position of assistant manager.").

Third, and as the lower court held, Paris's one-off comment to a co-worker is "so vastly different in scope and kind" from Hieber's complained-of behavior, he cannot show Paris "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Opinion and Order Granting MSJ, R. 78, PageID.3149 and 3150 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). While Young complained of a single offhand comment, Paris complained of a "'boarder pattern of behaviors' that Paris believed evidenced Hieber's discriminatory intent

44

based on age, sex, race, and gender." *Id*. PageID.3149. This 2021 complaint was premised on the fact that the training resulting from the 2020 investigation "did not achieve that objective [of creating a safer work environment]" as well as Hieber's comment openly deriding the County's diversity, equity, and inclusion efforts (*i.e.,* it was not a reiteration of the 2020 complaint). *Id*., PageID.3149. And while both complaints were investigated, the investigation into Hieber's conduct yielded significantly different results, including vocal concerns about employee safety. Accordingly, this Court should affirm the lower court's finding on this point, which is fatal to his *prima facie* claims of age discrimination.

> **2. Hieber cannot establish a prima facie case based on any adverse action other than his termination.**

It is unclear what adverse employment action(s) Hieber argues as the basis for his *prima facie* cases of age discrimination. Section II of his principal brief (addressing his age discrimination claims) appears focused on his termination. *See* Appellant's Brief, Doc. 36 Pg. 34-40. Appellees agree that Hieber's termination is an adverse employment action for purposes of his age discrimination claims. However, Hieber's Amended Complaint and Substantive Facts section reference a number of "adverse employment actions," including the County's early retirement incentive, placing Hieber on administrative leave, Jen's purportedly "defamatory" emails, and failed settlement negotiations. None of these, however, are referenced in Section II of his principal brief (and without agreeing that such actions remain the

bases of Hieber's discrimination and retaliation claims). Regardless, Hieber has not, and cannot, create a cognizable *prima facie* case of age discrimination.

### a. The Retirement Incentive Plan is not discriminatory.

It is "well-settled that discriminatory intent cannot be inferred from a voluntary early retirement incentive program" and instead, an early retirement plan must be "used as subterfuge for age discrimination." *Graves v. Fleetguard, Inc.*, 198 F.3d 245 (6th Cir. 1999) (citations omitted). Likewise, in addition to the traditional elements of a *prima facie* case of age discrimination, in the case of a reduction in force program (as Hieber may argue here), he must provide additional evidence indicating that age was a factor in eliminating him. *Adams v. Lucent Techs., Inc.*, 284 F. App'x 296, 301 (6th Cir. 2008) (citing *Scott v. Goodyear Tire & Rubber Co.,* 160 F.3d 1121, 1126 (6th Cir. 1998). There is no record evidence to this effect (Hieber did not opt into the Incentive and testified that his age was not the reason for his termination), and the plain language of the program makes it clear that neither Hieber nor older employees as a group were targeted by the Incentive.

### b. Placing Hieber on leave is not an adverse employment action.

To the extent that Hieber attempts to argue that his administrative leave was discriminatory, his claim fails. As a matter of law, paid administrative leave is not an adverse employment action. *See, e.g., Tudor v. Macomb Cty.,* 2021 WL 2026116, at *11 (Mich. Ct. App. May 20, 2021) (adopting Sixth Circuit's "unanimous" holding that paid administrative leave is not an adverse employment action and

cannot sustain ELCRA age discrimination claim).

### c. "Defamatory" remarks in emails and decision vis-à-vis the purported settlement are not adverse employment actions.

When Jen's emails were sent, Hieber was either on paid administrative leave or terminated from the County's employ. As Hieber cannot show how these comments affected the terms or conditions of his employment, they cannot be the basis of his discrimination claim. *See Stewart v. Esper*, 815 F. Appx. 8, 17-19 (6th Cir. 2020) (plaintiff failed to allege an adverse action where defendant made false accusations and offensive comments that did not materially change working conditions); *Blick v. Ann Arbor Pub. Sch. Dist.*, 516 F. Supp. 3d 711, 723 (E.D. Mich. 2021) (publishing a letter containing alleged "false and stigmatizing" information about plaintiff not an adverse action). The same is true of the settlement agreement reached *after* Hieber's employment ended.

### C. The Articulated Reasons for Hieber's Suspension and Termination Were Not Pretext for Discrimination.

The reasons for Hieber's suspension and termination were not pretext for discrimination. Regardless of whether Hieber can establish a *prima facie* case of discrimination, Appellees had legitimate, non-discriminatory reasons for his termination. As articulated in the Termination Notice, Hieber was terminated following the well-substantiated comments about the survey, other offensive comments, and consistent reports of him creating a toxic, intimidating, and

threatening workplace. These are clear violations of the Merit System Rules and support Cause for termination. Witness Interview Transcripts, R. 64-7 to 64-15 PageID.1143-1356.

Because Appellees articulated legitimate, nondiscriminatory reasons for terminating Hieber's employment, the burden shifts to Hieber to prove by a preponderance of the evidence that the articulated reasons were a pretext for discrimination. Hieber may establish pretext by showing that the stated reasons: 1) have no basis in fact; 2) were not the actual reasons for the action; or 3) are insufficient to explain the employer's action and must show not just that the reasons were pretextual, but that they were a pretext for illegal discrimination. *Rosenthal v. Nat'l Beverage Corp.*, 202 F. Supp. 3d 700, 706 (E.D. Mich. 2016), *aff'd sub nom. Rosenthal v. Faygo Beverages, Inc.*, 701 F. App'x. 472 (6th Cir. 2017). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, (1993) (emphasis in original)).

The Sixth Circuit has long-held "speculation," "conjecture," and "personal beliefs" are insufficient to support a claim of discrimination. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006); *see also McNeill-Marks v. MidMichigan Med. Ctr. Gratiot*, 316 Mich. App. 1, 16; 891 N.W.2d 528 (2016). Yet, these irrelevant personal feelings are all Hieber has to support his discrimination

claims and *admits* that he lacks facts or evidence that he was terminated or discriminated against on *any* basis. He unequivocally testified that he believed his termination was for reasons wholly separate from his age and repeatedly testified that he believed that there were members of a "clique" that wanted him terminated for their own self-serving reasons, including moving up the ladder after the majority of the Equalization department unionized. Hieber Transcript, R. 63-2, PageID.748 at 196:13:197:8, PageID.749 at 200:22-201:10, PageID.751 at 206:3-207:23, PageID.754-755 at 221:19-222:5, PageID.784-785 at 331:20-335:11, PageID.814 at 450:2-12, PageID.821 at 477:11-12, PageID.825 at 494:15-18; *see also* McCabe Transcript, R. 63-12, PageID.1044 at 8:1-13. Hieber's discrimination claims therefore must fail, as he does not have any facts that his age motivated his termination or any other complained-of action.

Hieber ignores his own admissions and argues that a question of fact exists around whether Appellees' articulated reasons for terminating him were based in fact, as they are premised on what multiple employees reported during the 2021 investigation—*i.e.,* hearsay. This argument does not hold water. The investigation interviews are clearly used to for the non-hearsay purpose of explaining what Appellees' knowledge and motivations were when suspending and terminating Hieber. *See, e.g., Rhoades v. Standard Parking Corp.*, 559 F. App'x 500, 506 (6th Cir. 2014); *see also Mayday v. Public Libraries of Saginaw*, 480 F.3d 815, 819-20

(6th Cir. 2007).

Furthermore, Jen had an honest belief based on the findings of the pre-termination investigation into Hieber's behavior, further illustrating that the reasons for Hieber's termination were not pretext for discrimination. *See Richardson v. Wal-Mart Stores, Inc.*, 836 F.3d 698, 706–07 (6th Cir. 2016) (citing *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590-591 (6th Cir. 2014). While Hieber argues that Appellees "cannot invoke the honest belief rule when that belief is based upon facts that are inadmissible hearsay," this is not true, and *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (which Hieber cites) does not mention hearsay, let alone support this proposition. Rather, in *Majewski*, this Court held that the plaintiff's own assertion that he did not commit the actions that led to his employment was "insufficient to call into question [the employer's] honest belief that he did." *Id.*; *cf Bhama v. Mercy Mem'l Hosp. Corp.*, 416 F. App'x 542, 553 (6th Cir. 2011) (applying honest belief doctrine to investigation statements plaintiff claimed were hearsay); *see also Rhoades*, 559 F. App'x at 506.

There is no record evidence that the investigation findings were not the reasons for Hieber's termination, and creating an unsafe and intimidating work environment is sufficient grounds for termination. There is also no evidence of animus of age discrimination—especially where Jen is a similar age as Hieber and Hieber admits he did not hear comments made about his age. Hieber Transcript, R.

63-2, PageID.731 at 129:15-25.

Despite this, Hieber argues that a jury could find that Appellees' reasons for terminating him were pretextual because the County 1) treated Paris move favorably than Hieber, 2) failed to apply its own policies (including the Non-Discrimination policy to Paris and the PAB rules to Hieber), and 3) fostered an ageist atmosphere— an allegation supported entirely by alleged comments by April Lynch, who was not the decisionmaker with respect to Hieber's leave and termination.

As previously discussed, the County did not treat Paris differently than Hieber. Furthermore, Hieber cannot use the same evidence to support his *prima facie* cases of discrimination and demonstrate pretext. *Provenzano*, 663 F.3d at 813-14 ("Error" occurred when district court "merged" its analysis of different stages of the burden shifting framework and considered the same evidence for plaintiff's prima facie case and to determine issue of pretext); *see also Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 85 (6th Cir. 2020) (where plaintiff uses the same evidence for *prima facie* and pretext analyses, plaintiff must "specifically rebut the employer's proffered legitimate, nondiscriminatory reason").

The County also did not selectively enforce its rules regarding PAB hearings (*see* Section II(B)(1), *supra*). Hieber was provided the opportunity to respond to the charges against him, which he unilaterally and voluntarily terminated, thereby denying himself to the opportunity to put on his own witnesses and evidence in

response. Moreover, there was no deviation from County policy, nor is there record evidence that Hieber's PAB hearing was conducted differently than anyone else's, much less a significantly *younger* individual.

The County was not obligated to issue subpoenas on Hieber's behalf or permit the admission of affidavits in lieu of live testimony, nor was it obligated to provide Hieber with all desired evidence in its custody. Hieber does not cite to *anything* to establish that he was entitled to these. To the contrary, "The [PAB] *may* subpoena witnesses and records *as it finds necessary*" (Merit System Rules, R. 72-2, PageID.2395 (emphasis added)) and "Affidavits of *unavailable witnesses, which address non-substantive issues, may* be admitted by the Chair." PAB Rules, R. 64-19, PageID.1397 (emphasis added).

Finally, Lynch's comments are not indicative of a discriminatory environment and have no bearing on the investigation findings. Lynch—who is close in age to Hieber—was not the decisionmaker with respect to Hieber's termination, nor is there any evidence that Lynch made comments to or about Hieber related to his age. Lynch Transcript R. 63-9, PageID.991 at 5:1-4, PageID.1003 at 54:23-55:2 and 56:3-56:18. *See Krohn v. Sedgwick James of Mich., Inc.*, 244 Mich. App. 289, 292; 624 N.W.2d 212 (2001) (stray remarks are insufficient to establish a discrimination claim). Her comments with respect to the retirement incentive in no way speak to any employee's age—a "nimble" workforce "for the future" can certainly include

employees who are protected by the ADEA.

## III.    HIEBER'S POLITICAL AFFILIATION RETALIATION CLAIM ALSO FAILS.

To establish his First Amendment political affiliation retaliation claim, Hieber must show: 1) he engaged in constitutionally protected conduct; 2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) a causal connection showing that the adverse action was motivated at least in part by his protected conduct. *Kubala*, 984 at 1139 (quoting *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). Should he do so, the burden shifts to Appellees "to prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Eckerman v. Tenn. Dept. of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (citing *Sowards v. Loudon Cty.*, 203 F.3d 426, 431 (6th Cir. 2000)).

Hieber's political retaliation claim is premised solely on his affiliation with the Patterson administration and not his supposed or presumed alignment with the Republican party. First Amended Complaint R. 4, PageID.91-92 ¶139-140; Hieber Transcript, R. 63-2, PageID.750 at 202:16-23 (acknowledged by Hieber's counsel).

The lower court granted summary judgment on this claim because there was insufficient evidence that Hieber engaged in any constitutionally protected conduct. Opinion and Order Granting MSJ R. 78, PageID.3172. This Court should affirm that finding. The Patterson Administration ended upon the passing away of former

Executive Patterson—that is, Hieber was never put in a position where he had to "take sides" between either Patterson or Coulter and has not otherwise established that he engaged in any protected activity. He does not allege that he ever voiced a lack of support for Coulter, told Jen or Coulter about his affiliation with the Republican party, or took any action adverse to the Coulter administration, such as showing support for a candidate opposite Coulter. Hieber Transcript, R. 63-2, PageID.731-732 at 129:2-131:2. Nor did Hieber hold a political position. The lack of any knowledge regarding Hieber's actual political affiliation is fatal to his claim. *Ocasio-Hernandez v. Fortuño-Burset*, 777 F.3d 1, 7–8 (1st Cir. 2015) (finding that the plaintiffs' political firing claim fails because there is no evidence that the defendants were aware of the workers' political affiliations; mere knowledge that an employee was hired by a prior governor, without more, is not sufficient to show knowledge).

Claims of political affiliation retaliation routinely fail as a matter of law when they are devoid of possessed or expressed political views, and conclusory allegations of perception are insufficient to prove such a claim. *See Bluegrass Dutch Tr. Morehead, LLC v. Rowan Cty. Fiscal Court*, 734 F. App'x 322, 328–29 (6th Cir. 2018); *Raspberry v. Madison Dist. Pub. Sch.*, 2023 WL 3632712, at *7 (E.D. Mich. May 24, 2023) (claim premised on "perceived association with losing candidates" failed). As the lower court noted, Hieber testified that he never discussed his personal

political beliefs with Jen or Executive Coulter. Hieber Transcript, R. 63-2, PageID.731-732 at 129:2-131:3. In the absence of any evidence that Appellees knew anything about Hieber's political preferences (including some continued loyalty to the deceased Patterson), his retaliation claim fails. *See Papin*, 2018 WL 6505363 at *7 (plaintiff failed to present sufficient evidence to establish protected conduct by virtue of his political affiliation where he offered only "broad references" to past political support of former sheriff-candidate); *see also Hall v. Tollett*, 128 F.3d 418, 426 (6th Cir. 1997) (summary judgment proper since the plaintiff failed to put forth evidence showing that the defendant knew the plaintiff supported his opponent); *Raspberry*, 2023 WL 3632712 at *8.

Even if Hieber could establish that Appellees knew of his supposedly opposing political affiliation, it is clear that Appellees would have still terminated his employment upon learning the concerns voiced during the investigation, and the reasons for his termination were not motivated by any kind of animus—political or otherwise. Interview Transcripts, R. 64-7 to 64-15, PageID.1143-1356. Any holding to the contrary would, as the lower court noted, be premised on "mere speculation." Opinion and Order Granting MSJ, R. 78, PageID.3154 (citing *Kelly v. Warren Cty. Bd. of Comm'rs*, 396 F. App'x 246, 250 (6th Cir. 2010)).

At its core, Hieber's political retaliation claim is based solely on the fact that he was employed by a previous administration aligned with a different political

party. He argues that he was viewed as politically loyal to the Patterson administration and that this is best evinced by the testimony of former Patterson administration employee Rosie Wood. *Id.* at PageID.3171 (citing R. 63-7, PageID.966). In relying on Wood's testimony, however, Hieber attempts to contort the undisputed fact that he was employed under the prior administration into a perception of loyalty so strong that it would equate to protected activity. Moreover, Wood was not the decisionmaker in this case. It follows that any understanding she had of Hieber's political affiliations is irrelevant.

Paris's personal belief that Hieber's views about the County's diversity, equity, and inclusion differed from the Coulter administration's, Lynch's alleged comments about "dead wood," and the early retirement incentive are also irrelevant to whether Appellees retaliated against Hieber because of his employment with the Patterson administration. Again, neither Paris nor Lynch were the decision makers with respect to Hieber's termination. Furthermore, his reliance on Lynch's alleged and supposedly agist comments as evidence that the County wanted to rid itself of prior Patterson administration employees is purely speculative and legally insufficient. It is also nonsensical, as there are numerous Patterson appointees continuing to serve the Coulter administration, including Fisher and Wood who participated in the investigations into Paris's grievances. Second, Paris's comment that "'once again' the County could be under leadership that did not support diversity

or an inclusive environment" is politically ambiguous. Without more, it cannot be ascribed to a political party. Furthermore, there is no record evidence that relates to Paris's political beliefs.

## IV. HIEBER CANNOT ESTABLISH A VIOLATION OF DUE PROCESS.

As a Merit System employee and under the law, prior to his termination, Hieber was entitled to: 1) pretermination notice of the charges against him, an explanation of the County's evidence against him, and an opportunity to present his side of the story as required by *Loudermill*, as well as 2) a post-termination evidentiary-style PAB hearing. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). However, "the Due Process Clause does not require that the plaintiff be allowed the full-blown process of a trial." *Ivezaj v. Detroit Pub. Sch.*, 2015 WL 7294576, at *6 (E.D. Mich. Nov. 19, 2015) (plaintiff not denied due process where he was afforded the chance to testify and offer some evidence but not allowed to present the number of witnesses and exhibits that he wanted to).

Where there is a system of post-termination procedures available to the employee coupled with a pre-termination "right of reply' hearing," the due process inquiry is satisfied. *Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004). This was the very process afforded to Hieber. PAB Rules, R. 64-19. The purpose of the pre-termination hearing under *Loudermill* was to inform Hieber of the bases for his termination, while the PAB hearing was Hieber's opportunity for an evidentiary-

style hearing. Termination Notice, R. 64-22, PageID.1419, PAB Rules, R. 64-19, PageID.1392-1402. Notably, in this case, Hieber was afforded an *additional* pretermination opportunity to be informed of the charges against him, hear the County's evidence, and tell his side of the story through his interview conducted in connection with the 2021 investigation.

### A. Hieber Received Sufficient Pre-Termination Due Process.

#### 1. The formal Loudermill hearing provided Hieber with sufficient due process.

The November 23, 2021 *Loudermill* hearing provided Hieber with appropriate due process. Prior to the hearing, Hieber was provided with the rules he was found to have violated (*i.e.,* the charges against him) and a written summary of the investigation findings (*i.e.,* the County's evidence against him). During the hearing, Hieber (represented by counsel) was again informed of the charges the County was making against him and reminded him that he had been provided with a summary of the investigation findings. Loudermill Transcript, R. 64-20, PageID.1407-1408 at 4:6-5:15. Hieber was then provided with the opportunity to make a statement, and he denied the charged rule violations. *Id.* at 5:16-23. Hieber's counsel was also afforded the opportunity to ask questions, at which time she indicated that she had none. *Id.* PageID.1409 at 6:1-8. Hieber and his counsel were then informed that he would have the opportunity to further challenge the action taken against him through

the PAB hearing. *Id*. at 6:13-18]. Because the opportunity for a post-deprivation hearing (like the PAB) "allows for an even less formal pre-termination hearing," the County provided Hieber with due process during his pre-termination *Loudermill* hearing. *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 409 (6th Cir.1992). Any argument that the County violated his due process rights by telling him that the *Loudermill* hearing was not the proper time to tell the entirety of his story therefore fails.

### 2. Hieber's investigation interview also and independently provided Hieber with sufficient due process.

Even before the *Loudermill* hearing, however, Hieber was made aware of the charges against him and the evidence of those charges during his November 12 interview that was conducted in connection with the investigation into Paris's 2021 grievance. As the lower court noted, which Hieber chooses to ignore in his brief on appeal, the County explicitly asked Hieber about statements he was accused of making. Opinion and Order Granting MSJ, R. 78, PageID.3157-61. Hieber was even informed that these comments were made by witnesses (*i.e.*, he was informed of the County's charges against him and the evidence supporting those charges). Hieber was afforded the due process to which he was entitled—namely, the "right to reply" to the charges against him when he was permitted to respond to questions about

those comments, including whether he made them. Additionally, Hieber had counsel present at the interview, and his counsel was also allowed to ask questions.

As the lower court correctly held, this interview satisfied the requirements of due process, as *Loudermill*'s mandate can be satisfied by means other than an official hearing. *See* Opinion and Order Granting MSJ, R. 78, PageID.3158 (citing *Bruckner v. City of Highland Park*, 901 F.2d 491(6th Cir. 1990)). This holding is consistent with the lower court's previous decisions holding that an interview like that which Hieber was part of can satisfy *Loudermill*. *See Brazil v. Michigan Dep't of Corr.*, 570 F. Supp. 2d 944, 947–48 (E.D. Mich. 2008) (plaintiff afforded pre-termination due process when he was informed of the evidence and charges against him and given an opportunity to present his side of the story both at an investigatory interview and a disciplinary conference); *Partlo v. Clarkston Cmty. Sch.*, No. 06-11023, 2007 WL 269447, at *10 (E.D. Mich. Jan. 26, 2007) (plaintiff was afforded due process where, in addition to other measures, plaintiff was given the opportunity to "present his side of the story" through an interview that was conducted as part of a workplace investigation).[5] It follows that, on its own, the investigation interview satisfies the requirements of pre-termination due process. Coupled with the *Loudermill* hearing,

---

[5] Hieber derides the lower court's decision to grant summary judgment because the pre-termination investigation interview satisfied due process, insinuating that the decision to do so violated the standard of review for a motion for summary judgment. However, Fed. R. Civ. P. 56(f)(2) makes it clear that the court my "grant the motion [for summary judgment] on grounds not raised by a party."

it is even more evident that Hieber was provided all pre-termination process to which he was entitled.

Hieber argues that the lower court's thoughtful and correct analysis of *Bruckner*, which likewise held that due process was satisfied outside of a formal *Loudermill* hearing, was inapt. He instead directs this court to *McDaniel v. Princeton City Sch. Dist. Bd. of Educ.*, 45 F. App'x 354 (6th Cir. 2002) for the idea that Hieber was not afforded a sufficient opportunity to respond to the charges against him. *McDaniel*, however, is easily distinguishable from this case. It is well-established that where an employee is provided with a two-step hearing process, the pretermination hearing can be less formal.

In *McDaniel*, however, the plaintiff was provided with a single pretermination hearing and no post-termination hearing, unlike Hieber's PAB hearing. Stated differently, the plaintiff in *McDaniel* had one opportunity to respond to the charges against her, and the basis of her termination was not discussed at this one pre-termination hearing. That is not the case here. Hieber was expressly asked about statements that served as the basis of his termination during the investigatory interview *and* he had been provided with notice of the bases for his termination before and during the *Loudermill* hearing and was afforded the opportunity to make a statement about the reasons for his termination. As discussed *infra*, Hieber was

then afforded an additional opportunity to provide an additional response and state his case during the evidentiary-style PAB hearing, *which he ultimately terminated*.

## B. The Personnel Appeal Board Hearing Provided Hieber with Due Process.

In addition to the pre-termination hearing, Hieber challenges the legitimacy of the evidentiary-style PAB hearing, through which he (with the assistance of counsel) would have had the ability to present live witnesses, cross examine the County's witnesses, and introduce other evidence. *See Carter v. W. Rsrv. Psychiatric Habilitation Ctr.*, 767 F.2d 270, 273 (6th Cir. 1985). However, Hieber's challenges ignore the dispositive and uncontested fact that he chose to unilaterally end the PAB process while the County was working with Hieber to schedule a continued hearing date. The Sixth Circuit prohibits employees from asserting due process claims where, as here, the employee refuses to participate or chooses not to participate in the post-termination proceedings. In such cases, the employee has waived his procedural due process claim. *Farhat*, 370 F.3d at 596 (citing *Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 904 (8th Cir. 2000)). Hieber therefore cannot attempt to hold the County accountable for any due process "violation" resulting from his own choices. Because Hieber has waived his due process claim, the Court's analysis should end here, and it should affirm the lower court's summary dismissal of Hieber's due process claim.

While disregarding this fatality, Hieber argues that Appellees violated his post-termination due process rights when the PAB did not issue subpoenas or otherwise order employees to participate in the hearing, supposedly refused to disclose its evidence against Hieber prior to his termination and the PAB hearing, refused to provide Hieber with documents he requested, and "ignored" a "conflict of interest" involving PAB member Barry Lepler. None of these amount to a deprivation of due process, nor are they supported by the record.

### 1. The County was under no obligation—legal or otherwise—to subpoena witnesses.

As noted *supra*, Hieber was not entitled to "the full-blown process of a trial" nor does he cite to any law for the idea that he was entitled to "present his evidence and witnesses *in the manner he chose*" during the PAB. Appellant's Brief, Doc. 36, Pg. 59-60.[6] And while it is true that Hieber had the right to present witnesses and evidence during the hearing, there is nothing in the record—or in the law—that entitled Hieber to have to have the County issue subpoenas to potential witnesses on his behalf or otherwise order them to appear.  In fact, Hieber himself relies on the expressly discretionary nature of subpoena use at PBA hearings, noting, "The Board

---

[6]Hieber also argued that there is a question of fact as to whether affidavits were permitted at the PAB hearing. Not only is this fact not dispositive, but there is simply no evidence (and therefore no question of fact) to support Hieber's position that he was entitled to submit any and all witness testimony in the form of affidavits.

*may* subpoena witnesses and records *as it finds necessary*." *Id.* at Pg. 58 (citing R. 72-2, PageID.2395).

Even if this were not the case, the spirit of Hieber's argument and the requirements of due process imply that it would be fundamentally unfair for a terminated employee to be deprived of the opportunity to have people testify in this favor. It is undisputed, however, that Hieber was able to contact favorable witnesses and obtain affidavits ahead of the PAB hearing, eliminating any concern of such unfairness and dispelling any argument that Jen's emails had a chilling effect on his ability to contact potential witnesses. MSJ, R. 63 PageID.672 ¶39; Plaintiff's Witness Statements, R. 64-26 PageID.1500-1509; Text Messages from Hieber, R. 64-27, PageID.1511. While the PAB panel determined at the first day of the hearing that it would ultimately like to hear from those witnesses directly, it was well within its rights to do so, as the PAB rules do not require that a panel permit affidavits in lieu of live testimony. PAB Rules, R. 64-19, PageID.1392-1402; Woodward Transcript R. 63-10, PageID.1014-1015 at 36:1-37:15, 39:9-17. Indeed, the PAB rules provide, *at most*, that "[a]ffidavits of unavailable witnesses, which address *non-substantive* issues *may* be admitted by the Chair." PAB Rules, R. 64-19, PageID.1397 (emphasis added). Furthermore, the County's own corporation counsel stated on the record during the hearing that the County was having difficulty getting witnesses to speak with them, noting "There is no subpoena power for these

proceedings…We have also attempted to contact individuals…I don't have an opportunity to compel those individuals to appear any more than counsel does." PAB Transcript, R. 64-25 PageID.1441-1443 14:14-16:14. The record is clear that *neither* side relied on witnesses who had been subpoenaed, thereby eliminating a hypothetical power imbalance or lack of evidence that was caused by the County. Hieber was always offered an ample opportunity to tell his side of the story.

The County also offered numerous reassurances that it would work to ensure witness cooperation on Hieber's behalf--including on the record. Email from Hieber's Attorney R. 64-28, PageID.1513; PAB Transcript, R. 64-25, PageID.1437-1443, 10:12-11:1, 14:11-21, 16:6-14; Woodward Transcript, R. 63-10, PageID.1015-16, 39:19-40:1, 40:23-41:16. Meanwhile, Hieber has been unable to identify *any* witnesses who refused to appear for the PAB and testify on his behalf— including those from whom he obtained affidavits. Likewise, Hieber (through counsel) had—and took—the opportunity to cross examine Paris—the only witness for the County that was ever examined as part of the hearing, as Hieber called the hearing off before the County could present the remainder of its case and before Hieber would have had the opportunity to put on his own witnesses.

### 2. Due process required the explanation of evidence only.

Hieber also argues that he was denied due process when he was not provided with copies the County's evidence prior to the PAB. Again, however, Hieber was

entitled "to know and have an opportunity to challenge the evidence against him"—not to copies of the evidence or formal review of the entirety of the County's evidence. *Carter*, 767 F.2d at 273. Indeed, Hieber cites to nothing in the record or any case law to support his belief that he was entitled to as much. What *is* undisputed, the fact that Hieber was provided with a summary of the County's evidence prior to the PAB, which included a description of the County's investigation and the direct quotes on which Appellees were basing the termination decision. That is, Hieber knew the evidence on which Appellees were relying when they decided to terminate him—just as required. Additionally, the fact that Hieber was able to obtain statements and contact witnesses suggests that he had a sufficient understanding of the County's evidence that he could request what he needed to attempt to counter it, and had Hieber continued the PAB hearing, he would have had the opportunity to cross examine the County's witnesses (*i.e.,* respond to the County's evidence).

### 3. There is no evidence of a conflict of interest.

Hieber argues that the PAB board member Barry Lepler had a conflict of interest, such that the PAB hearing could not have afforded Hieber with due process.

As an initial matter, Hieber never sought the recusal or disqualification of Lepler, even though he had the ability to do so. PAB Rules, R. 64-19, PageID.1393. Because Hieber had the opportunity to raise a conflict of interest but declined to do so, this argument should be barred by laches or considered waived.

What is more, Hieber's claim of a conflict of interest comes solely from one email from another County employee, in which she disclosed her friendship with Lepler. Hieber points to no evidence contradicting Chambers' testimony she did not speak to Lepler about Hieber' termination or the PAB, nor is there any evidence of animus towards Hieber from either Lepler or Chambers or a conflict of interest otherwise. Chambers Transcript, R. 63-8, PageID.985-987 at 25:12-30:7, 32:6-35:6. And as the lower court noted, nor did Hieber make any effort to develop such a record. Opinion and Order Granting MSJ, R. 78, PageID.3162-63. Hieber writes, "The question is why Ms. Chambers would express such a degree of excitement about the fat that one of her 'besties' was on the board" and "The fact that Ms. Chamber would express such excitement also permits more nefarious inferences." Appellant's Brief, Doc. 36, Pg. 61-62. However, in the absence of any other facts whatsoever about relationship between Chambers and Lepler, and where Chambers was neither decisionmaker nor present at Hieber's *Loudermill* and PAB hearings, Hieber cannot establish that his due process rights were violated with a single sentence in an email.

## V.   HIEBER DOES NOT HAVE A VIABLE CLAIM OF DEFAMATION.

Hieber appeals the lower court's decision to grant summary disposition of his defamation claim. Hieber premises his defamation claim on Jen's October 22 and November 24 emails. Both emails convey three things: Hieber's absence or

termination, reassurance to employees of a safety and supportive work environment, and certain safety-related instructions. Hieber cannot point to any language in either email which was false or defamatory, instead calling the emails part of a "witch hunt." Hieber Transcript, R. 63-2, PageID.810 at 434:16-436:20.

While Michigan courts have recognized a cause of action for defamation by implication for private individuals, it has not done so for public officials like Hieber. *Siddiqui v. Gen. Motors Co.*, 2012 WL 335680, at *4 (Mich. Ct. App. Feb. 2, 2012) (acknowledging, "This Court has extended defamation by implication to private figure plaintiffs and non-media defendants" and citing *Hawkins v. Mercy Health Services, Inc,* 230 Mich. App. 315, 326; 583 N.W.2d 725 (1998)). Even if Hieber could sustain such a claim, it would fail on the merits. Defamation (based on implication or otherwise) requires: 1) a false and defamatory statement concerning the plaintiff, 2) an unprivileged communication to a third party, 3) fault amounting to at least negligence on the part of the publisher, and 4) either actionability of the statement irrespective of special harm ... or the existence of special harm caused by publication. *Kevorkian v. American Med Ass'n*, 237 Mich. App. 1, 8; 602 N.W.2d 233 (1999).

### A. At Most, Jen's Emails Contain Statements of Opinion and Relate to Future Events and are Therefore Not Defamatory.

Hieber could not point to a single false statement in the emails from Jen. While Hieber may disagree with what *he* believes was implied in the emails, he cannot

68

point to anything concerning himself that is not true or made with actual malice—

especially where Jen had a good faith belief that he needed ensure employee safety.

Jen Transcript, R. 63-3, PageID.848 at 22:12-23:18, PageID.849 at 27:16-28:10,

PageID.851-852 at 36:1-37:8, PageID.853 at 41:6-42:20, PageID.854-856 at 45:24-

53:13. Each email was truthful and advised employees within a single department of

the County that Hieber was no longer allowed on the premises. Additionally, as the

lower court held, statements (and by extension, inferences) about hypothetical future

events by their very nature cannot be statements of fact and are therefore not

defamatory. Opinion and Order Granting MSJ, R. 78, PageId.3169 (citing *Cenveo*

*Corp. v. CelumSolutions Software GMBH & Co. KG*, 504 F. Supp. 2d 574 (D. Minn.

2007) ("the statement...is a statement about future events and therefore does not

imply the existence of a fact")). To this end, no objective and reasonable person

would consider these communications defamatory. *See e.g.*, *Roboczkay v. City of*

*Taylor*, 2019 WL 6254870, at *6 (E.D. Mich. Nov. 22, 2019) (letter to city

employees stating that a police officer was placed on administrative leave pending

an investigation not defamatory).

At most, Jen's emails to Department employees only convey his opinion that

Hieber may pose a safety risk, and expressions of opinions are not actionable as

defamatory statements. *Hope-Jackson v. Washington*, 311 Mich. App. 602, 621-622

(2015); *Hodgins v. Times Herald Co.*, 169 Mich. App. 245, 253-54 (1988) (citing

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974). As the lower court noted, "At worst, the emails suggest Jen's *opinion* about Hieber's possible future conduct, not a false statement about his actual conduct." Opinion and Order Granting MSJ, R. 78, PageID.3169 (citing *Lakeshore Cmty. Hosp., Inc. v. Perry*, 212 Mich. App. 396 (1995) (expressions of opinion are not actionable in defamation)). Because such statements are not actionable as defamation, this claim fails.

Hieber spends a considerable amount of time pointing out what he believes the implications of Jen's emails *are* while failing to address the actionability of those implications. And while his arguments are voluminous, they do nothing to overcome the fundamentally unactionable nature of Jen's emails as explained *supra*. The lower court's analysis of Hieber's claim is not—as his counsel states—"confused," nor does it ignore Hieber's argument that Jen's emails supposedly imply that he is dangerous person. While Hieber takes issue with the lower court's apparent "combining" of the analysis of defamation by implication and defamation premised on statements of opinion, he does the same thing. The lower court's analysis clearly discusses both defamation by implication and statements of opinion, as well as their interplay, because Hieber has brought a defamation claim so attenuated that the lower court must consider his claim under both lenses. In fact, Hieber does the same in his own briefing. Appellant's Brief, Doc. 36, Pg. 66 ("The recognition of mixed statements of opinion, which implies the existence of undisclosed defamatory fats

goes to the heart of Hieber's claim, because Hieber has brought forth a claim of defamation by implication."). It follows that his defamation claim fails.

## B. Jen's Emails are Protected by Qualified Privilege.

However, accepting Hieber's position that Jen's emails imply that Hieber created a safety risk does not end the Court's analysis or necessitate a determination that Appellees' Motion for Summary Judgment should have been denied. As the lower court also held (and as this Court should affirm), Jen's emails are protected by qualified privilege.

Qualified privilege is an immunity to defamation that exists between people who have an interest in the subject matter of the communication. *Smith v. Fergan*, 181 Mich. App. 594, 597; 450 N.W.2d 3 (1989). The elements of qualified privilege are: 1) good faith; 2) an interest to be upheld; 3) a statement limited in scope to this purpose; 4) a proper occasion; and 5) publication in a proper manner and to proper parties only." *Id*. An employer has the "qualified privilege to defame an employee by publishing statements to other employees whose duties interest them in the same subject matter." *Id.*

In instances of qualified privilege, there is a presumption of good faith. *Nuyen v. Slater*, 372 Mich. 654, 660, 127 N.W.2d 369 (1964). Qualified privilege may be overcome "only by a showing that the statement was made with actual malice, i.e., with knowledge of its falsity or reckless disregard of the truth." *Id.* (quoting *Prysak*

71

*v. R. L. Polk Co.*, 193 Mich. App. 1, 15; 483 N.W.2d 629 (1992)). This burden lies

with the plaintiff (citing *Ireland v. Edwards*, 230 Mich. App. 607, 615, 584 N.W.2d

632, 637 (1998)), and "[g]eneral allegations of malice are insufficient to establish a

genuine issue of material fact." *Tarver* at *4 (quoting *Prysak*, 193 Mich. App. at 15).

Likewise, "a party's own subjective beliefs cannot serve as evidence that defendants

had actual knowledge that the allegations were false and cannot rebut the

presumption of good faith." *Id.* Whether qualified privilege applies is a matter of law

to be determined by the Court. *Mazloum v. Bemis*, No. 336930, 2018 WL 3244136,

at *7 (Mich. Ct. App. July 3, 2018); *Couch v. Schultz*, 193 Mich. App. 292, 294; 483

N.W.2d 684 (1992).

Ignoring that the applicability of qualified privilege is a matter of law, Hieber

argues that there remains a question of fact as to whether Jen's emails were made

with "actual malice." While a showing of actual malice would necessitate a finding

that the emails are privileged, to establish actual malice, Hieber must show that Jen

knowingly or recklessly made false statements, which "may be evidenced by a

fabrication of the defamatory statements or implications." Appellant's Brief, Doc

36, Pg. 71-72.  Hieber offers nothing than a purely speculatory idea that a reasonable

juror could conclude that Jen intentionally created false implications in his emails.

There is nothing in the record (nor does Hieber cite to anything) to suggest that Jen

was acting with malic or deliberately created "false implications" where, as

explained *supra*, he was taking action based on the concerns other employees expressed for their safety and where Jen consulted with others about how to convey the information and sent them in response to safety concerns. In short, Hieber has nothing but "general allegations of malice" and his "own subjection beliefs" to support his position, and these cannot overcome the presumption of good faith.

Additionally, Jen had a clear interest in promoting the safety of County employees and simply conveyed safety protocols to employees of the Equalization department only. With all the elements met, it follows that the emails are privileged. *See Mazloum*, 2018 WL 3244136, at *7 (statements not defamatory where there was a shared interest in staffing sheriff's office with officers "who do not violate the ethics, rules, and regulations of the department"); *Greggs v. Andrews Univ.*, 2003 WL 1689619, at *6 (Mich. Ct. App. Mar. 27, 2003) (statements made by residence hall advisor to students that another student was "immoral" and "had been involved in a rape" not actionable as defamatory because qualified privilege applied to communication between those with a "shared interest" in safety); *see also Sullivan v. River Valley Sch. Bd.*, 1997 WL 33344778, at *3-4 (Mich. Ct. App. July 11, 1997). Accordingly, the Court should affirm the lower court's holding that "Hieber failed to point to any evidence that would contradict Defendants' evidence that the emails were sent in good faith and otherwise satisfy the test for qualified privilege." Opinion and Order Granting MSJ, R. 78, PageID.3172.

## VI.    JEN IS ENTITLED TO QUALIFIED IMMUNITY.

As the decisionmaker with respect to Hieber's termination, Jen is entitled to qualified immunity. Qualified immunity is an affirmative defense that shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Once the defense is raised, the plaintiff bears the burden of showing that the defendant's conduct violated a right so clearly established that a reasonable official in that position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). Therefore, it is Hieber's burden to show that Jen is not entitled to qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

The only constitutional rights cited by Hieber are his right to a due process hearing under *Loudermill* and his preempted claim that the 14th Amendment shields him from discrimination based on his age. However, Hieber has not established (not can he) that Jen participated in the hearing process or refused to provide Hieber with due process protections. Likewise, Hieber has not established that Jen terminated Hieber's employment because of his age. The allegations Hieber has made against Jen relate to his performance of discretionary functions in his capacity as a

government official, and Hieber has not and cannot demonstrate that Jen violated a right of Hieber's that is "so clearly established." It follows that the lower court was correct in dismissing Jen as a defendant from this lawsuit, and this Court should hold similarly.

In his principal brief, Hieber offers little more than a blanket recitation of the standard for qualified immunity and states that the lower court erred when it held that Jen was entitled to qualified immunity because the lower court also aired when it failed to find there was a factual dispute regarding Hieber's constitutional claims. However, as explained *supra*, it is clear that Jen did not violate any of Hieber's clearly established rights. Accordingly, the Court should affirm the lower court's decision to grant Jen qualified immunity.

## CONCLUSION

Based on the controlling precedent and arguments presented, Defendants-Appellees respectfully request that the Court affirm the district court's Opinion and Order granting Defendants' Motion for Summary Judgment, along with any other relief this Court deems equitable.

Respectfully submitted,

s/ Christopher M. Trebilcock

Christopher M. Trebilcock (P62101)
CLARK HILL PLC
*Attorneys for Defendants-Appellees*

Dated: December 10, 2024

75

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(g)</u>

### *Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements*

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the Court's Order entered on November 19, 2024 (*see* Order, Doc. 38) because the brief contains 15,381 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman style.

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2024, I electronically filed Defendants-Appellees' Brief on Appeal with the Clerk of the Court using the ECF System which will send notification of such filing to all ECF participants of record.

Respectfully submitted,

s/ Christopher M. Trebilcock

Christopher M. Trebilcock (P62101)
Brian D. Shekell (P75327)
CLARK HILL PLC
500 Woodward Avenue, Suite 3500
Detroit, MI 48226
(313) 965-8300
ctrebilcock@clarkhill.com
bshekell@clarkhill.com
*Attorneys for Defendants-Appellees*
*Oakland County and Kyle Jen*

Dated: December 10, 2024

**ADDENDUM**

**DEFENDANTS-APPELLEES' DESIGNATION OF RELEVANT RECORD DOCUMENTS**

| Record Entry No. | Page ID # | Date Filed | Description of Document |
|---|---|---|---|
| 4 | 65-97 | 6/30/2022 | First Amended Complaint |
| 63 | 652-694 | 8/24/2023 | Defendants' Motion for Summary Judgment |
| 63-2 | 697-841 | 8/24/2023 | Hieber Transcript |
| 63-3 | 842-867 | 8/24/2023 | Jen Transcript |
| 63-4 | 868-907 | 8/24/2023 | Bertolini Transcript |
| 63-5 | 908-936 | 8/24/2023 | Van Pelt Transcript |
| 63-6 | 937-958 | 8/24/2023 | Fisher Transcript |
| 63-7 | 959-977 | 8/24/2023 | Wood Transcript |
| 63-8 | 978-988 | 8/24/2023 | Chambers Transcript |
| 63-9 | 989-1004 | 8/24/2023 | Lynch Transcript |
| 63-10 | 1005-1024 | 8/24/2023 | Woodward Transcript |
| 63-11 | 1025-1041 | 8/24/2023 | Hain Transcript |
| 63-12 | 1042-1050 | 8/24/2023 | McCabe Transcript |
| 63-13 | 1051-1057 | 8/24/2023 | Young Transcript |
| 63-14 | 1058-1064 | 8/24/2023 | County of Oakland Non-Discrimination Policy |
| 63-15 | 1065-1077 | 8/24/2023 | Paris Email October 7, 2024 |
| 63-16 | 1078-1089 | 8/24/2023 | Paris Interview |
| 63-17 | 1090-1102 | 8/24/2023 | Wood Interview |
| 64-1 | 1105-1114 | 8/24/2023 | Memo |
| 64-5 | 1136-1139 | 8/24/2023 | Memo re: Separation and Retirement Incentive |
| 64-6 | 1140-1142 | 8/24/2023 | Paris Email October 18, 2024 |
| 64-7 | 1143-1167 | 8/24/2023 | McLeod Interview |
| 64-8 | 1168-1200 | 8/24/2023 | Doyle Interview |
| 64-9 | 1201-1234 | 8/24/2023 | Marshall Interview |
| 64-10 | 1235-1251 | 8/24/2023 | Glenn Interview |
| 64-11 | 1252-1279 | 8/24/2023 | Isenberg Interview |

| 64-12 | 1280-1303 | 8/24/2023 | Walsh Interview |
| 64-13 | 1304-1317 | 8/24/2023 | Meder Interview |
| 64-14 | 1318-1349 | 8/24/2023 | Bouchey Interview |
| 64-15 | 1350-1356 | 8/24/2023 | Notice of Intent to Dismiss |
| 64-17 | 1359-1361 | 8/24/2023 | Jen Email October 22, 2021 |
| 64-19 | 1391-1402 | 8/24/2023 | PAB Rules |
| 64-20 | 1403-1411 | 8/24/2023 | Loudermill Transcript |
| 64-21 | 1412-1417 | 8/24/2023 | Decision Letter |
| 64-22 | 1418-1419 | 8/24/2023 | Termination Notice |
| 64-23 | 1420-1422 | 8/24/2023 | Jen Email November 24, 2021 |
| 64-24 | 1423-1426 | 8/24/2023 | Hieber Email December 6, 2021 |
| 64-25 | 1427-1498 | 8/24/2023 | PAB Transcript, Dated January 28, 2022 |
| 64-26 | 1499-1509 | 8/24/2023 | Plaintiff's Witness Statements |
| 64-27 | 1510-1511 | 8/24/2023 | Text Messages from Hieber |
| 64-28 | 1512-1513 | 8/24/2023 | Mastromarco Email January 10, 2022 |
| 64-29 | 1514-1515 | 8/24/2023 | Declaration of Angie Broegman-Stinde |
| 72-2 | 2345-2450 | 10/24/2023 | Merit System Rules |
| 78 | 3125-3172 | 3/27/2024 | Opinion and Order Granting MSJ |